# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
June 2, 2015 Session

## VODAFONE AMERICAS HOLDINGS, INC. & SUBSIDIARIES v. RICHARD H. ROBERTS, COMMISSIONER OF REVENUE, STATE OF TENNESSEE

**Appeal by Permission from the Court of Appeals, Middle Section
Chancery Court for Davidson County
No. 071860-IV     Russell T. Perkins, Judge**

_____

**No. M2013-00947-SC-R11-CV – FILED MARCH 23, 2016**

_____

In this appeal, we review a tax variance. The Commissioner of Tennessee's Department of Revenue determined that, if the standard apportionment formula in Tennessee's franchise and excise tax statutes were applied to the appellant taxpayer, a multistate wireless telecommunications company, nearly all of the taxpayer's sales receipts for services to its Tennessee customers—over a billion dollars in receipts—would not be subject to Tennessee franchise and excise taxes. Pursuant to his authority under Tennessee's franchise and excise tax variance statutes, the Commissioner imposed on the taxpayer a variance that required the taxpayer to pay taxes on the receipts from its Tennessee customers. The taxpayer now argues that, by imposing the variance, the Commissioner has usurped the legislature's prerogative to set tax policy. After review of the legislative history, we find that Tennessee's legislature intended for the Commissioner to have the authority to impose a variance where, as here, application of the statutory apportionment formula does not fairly represent the extent of the taxpayer's business activity in Tennessee. We decline to judicially abrogate the legislature's express delegation of this authority to the Commissioner. The variance in this case comports with Tennessee's franchise and excise tax statutes, the implementing regulation, and the statutory purpose of imposing upon corporations a tax for the privilege of doing business in this State. Finding no abuse of the Commissioner's discretion, we affirm.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the
Chancery Court and Court of Appeals Affirmed**

HOLLY KIRBY, J., delivered the opinion of the Court, in which SHARON G. LEE, C.J., and CORNELIA A. CLARK and GARY R. WADE, JJ., joined. JEFFREY S. BIVINS, J., filed a separate opinion, concurring in part and dissenting in part.

Michael D. Sontag, Stephen J. Jasper and Ashley N. Bassel, Nashville, Tennessee, for the appellant, Vodafone Americas Holdings, Inc.

Herbert H. Slatery III, Attorney General and Reporter, William E. Young, Associate Attorney General, Charles L. Lewis, Deputy Attorney General, and Talmage M. Watts, Senior Counsel, Nashville, Tennessee, for the appellee, Richard H. Roberts,[1] Commissioner of Revenue, State of Tennessee.

Joseph F. Welborn, III, Lauren B. Patten, Catherine Picou Oryl, Christopher Andrew Wilson and George Michael Yopp, Nashville, Tennessee for the Amicus Curiae, Council on State Taxation.

Carolyn W. Schott, Nashville, Tennessee for the Amicus Curiae, The Institute for Professionals in Taxation.

Brett R. Carter, Nashville, and Jeffrey Friedman, Washington, D.C., for the Amicus Curiae, Tennessee Cable Telecommunications Association.

Joe Huddleston, Helen Hecht, and Bruce Fort, Washington, D.C., for the Amicus Curiae, Multistate Tax Commission.

## OPINION

---

[1] As noted by the Court of Appeals in this case:

> Reagan Farr was the Commissioner of Revenue of the State of Tennessee when this action was commenced[,] and he was a defendant in his official capacity. Tenn. R. App. P. 19(c) provides that when an officer of the state is a party in his official capacity and during the pendency of the action he ceases to hold office, the officer's successor is automatically substituted as a party. Richard H. Roberts succeeded Mr. Farr as Commissioner of Revenue. Thus, pursuant to Tenn. R. App. P. 19(c), Commissioner Roberts is substituted for Mr. Farr as the defendant.

Vodafone Ams. Holdings, Inc. v. Roberts, No. M2013-00947-COA-R3-CV, 2014 WL 2895900, at *16 (Tenn. Ct. App. June 23, 2014), *permission to appeal granted* (Nov. 20, 2014).

FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff/Appellants Vodafone Americas Holdings, Inc., and Subsidiaries ("Vodafone" or "taxpayer")[2] own a 45% partnership interest in Cellco Partnership, a Delaware company that does business throughout the United States as Verizon Wireless. Verizon Wireless provides wireless communication and data services to customers nationwide, including customers in Tennessee.

As discussed more fully *infra*, Vodafone calculated its franchise and excise tax liability for the period from December 31, 2000, through March 31, 2006, by determining its sales billed to Cellco customers with a Tennessee billing address and including that amount in the apportionment formula sales factor. Utilizing that method, Vodafone paid the State of Tennessee franchise and excise taxes totaling over $13 million during that period.

At some point, Vodafone retained new tax and accounting counsel; it reviewed the method used by Vodafone to calculate its franchise and excise taxes in several states, including Tennessee, for the period from December 31, 2000, through March 31, 2006. After doing so, the new counsel opined that, for that period, Vodafone had not engaged in any activity in Tennessee that would constitute "business activity" within the meaning of Tennessee tax laws. Vodafone's new counsel took the position that Vodafone actually owed no franchise and excise taxes to Tennessee for that period, so the entirety of the over $13 million paid to Tennessee constituted an overpayment.

In light of this opinion from its new counsel, Vodafone filed claims with the Tennessee Department of Revenue ("Department") seeking a refund of all franchise and excise taxes it had paid for December 31, 2000, through March 31, 2006. Vodafone asserted that, during that period, it did not have "a taxable presence in the state," so virtually all of the taxes it had paid for that period constituted an overpayment. The Department denied Vodafone's refund claims in their entirety.[3]

In August 2007, Vodafone filed the instant lawsuit against the Commissioner of Revenue for the State of Tennessee ("Commissioner"). Vodafone's original complaint asserted that it was not doing business in Tennessee and did not have a taxable nexus

---

[2] Verizon Communications Inc. owns the remaining 55% interest in Cellco; however, it has no involvement in this appeal.

[3] Vodafone and its subsidiaries initially filed formal requests for refunds for the earlier years at issue and received a waiver of the requirement for filing additional refund claims (on the same bases, but for additional years and entities).

with Tennessee, so it was entitled to a refund of the franchise and excise taxes it had paid for the relevant period.[4] The Commissioner filed an answer denying Vodafone's claims.

After the litigation had been underway for some time, Vodafone commissioned a tax study by PricewaterhouseCoopers (PwC) concerning the method Vodafone had used to calculate its taxes in a number of states, including Tennessee. The PwC study took the position that Vodafone had utilized the wrong methodology to calculate its franchise and excise taxes for Tennessee, and other states as well, for the period in question. Among its findings was a conclusion that Vodafone should have used a cost-of-performance methodology that would have excluded from Tennessee franchise and excise taxes all of Vodafone's earnings from Tennessee telecommunication service contracts. Based on the PwC study, Vodafone amended its complaint to include alternative legal theories for its claim for a partial refund.

Among the amendments to Vodafone's complaint was the addition of Count Eight. This new count asserted for the first time that the primary-place-of-use method originally used by Vodafone to calculate its franchise and excise taxes for the Relevant Period was inconsistent with Tennessee's statutes. It alleged that Vodafone had erroneously calculated the proportion of its earnings attributable to Tennessee by sourcing sales of its telecommunications services to Tennessee whenever the customer had a Tennessee billing address. The amended complaint asserted that this method was contrary to Tennessee law and had resulted in an overstatement of the amount of Vodafone's earnings attributable to Tennessee for the relevant tax period. The correct methodology for sales other than tangible personal property, the amended complaint claimed, was cost of performance, that is, attributing Vodafone's earnings to Tennessee only if most of Vodafone's earnings-producing activities or "costs of performance" took place in Tennessee. The great majority of Vodafone's receipts in Tennessee came from services rather than the sale of tangible personal property, i.e., cell phone service as opposed to the sale of cell phones and related items. Vodafone contended that the greater proportion of its costs associated with such services were incurred in another state, namely, New Jersey. Consequently, the amended complaint asserted that millions of dollars that Vodafone had paid to Tennessee in franchise and excise taxes during the relevant tax period constituted an overpayment for which a refund was due.[5]

---

[4] Vodafone originally sought refunds for the years 2000 through 2006. As noted below, however, Vodafone later abandoned the claims for the years 2000 and 2001 because the statute of limitations had run as to those tax years.

[5] Count Eight of Vodafone's amended complaint is quoted at length in the majority opinion of the Court of Appeals. See Vodafone Americas Holdings, Inc., 2014 WL 2895900, at *2-3.

4

In February 2009, the Commissioner filed an answer to the amended complaint, denying all claims. The Commissioner asserted that the statute of limitations had run on Vodafone's claims regarding taxes paid for the years 2000 and 2001. Subsequently, in recognition that the limitations period had lapsed, Vodafone abandoned its claims for those years. It is undisputed, then, that the tax period at issue in this appeal is January 1, 2002, to March 31, 2006 (the "Relevant Period").

On May 21, 2010, the Commissioner sent Vodafone a letter notifying Vodafone of his decision to invoke his authority under Tennessee Code Annotated §§ 67-4-2014(a)[6] and 67-4-2112(a)[7] to impose a "variance" as to Vodafone's franchise and excise taxes for

---

[6] Section 67-4-2014(a) provides:

If the tax computation, allocation or apportionment provisions of this part or chapter 2 of this title do not fairly represent the extent of the taxpayer's business activity in this state, or the taxpayer's net earnings, the taxpayer may petition for, or the department through its delegates may require, in respect to all or any part of the taxpayer's business activity, if reasonable:

(1) Separate accounting;

(2) The exclusion of any one (1) or more of the formula factors;

(3) The inclusion of one (1) or more additional apportionment formula factors that will fairly represent the taxpayer's business activity in this state;

(4) The use of any other method to source receipts for purposes of the receipts factor or factors of the apportionment formula numerator or numerators; or

(5) The employment of any other method to effectuate an equitable computation, allocation and apportionment of the taxpayer's net earnings or losses that fairly represents the extent of the business entity's activities in Tennessee.

Tenn. Code Ann. § 67-4-2014(a) (2015).

[7] Section 67-4-2112(a) provides:

If the tax computation, allocation or apportionment provisions of this part do not fairly represent the extent of the taxpayer's business activity in this state, or the taxpayer's net worth, as adjusted, the taxpayer may petition for, or the department through its delegates may require, in respect to all or any part of the taxpayer's business activity, if reasonable:

(1) Separate accounting;

(2) The exclusion of any one (1) or more of the formula factors;

5

the Relevant Period. As set forth in these statutes, under certain circumstances discussed more fully below, the Commissioner may "vary" from the statutory method for calculating a particular taxpayer's franchise and excise taxes; hence, such an action is referred to as issuing or imposing a variance. The taxpayer may request such a variance or the Commissioner may, of his own volition, decide to impose one on the taxpayer. In this case, the Commissioner exercised his discretion to impose the variance on Vodafone.

The Commissioner's letter to Vodafone set forth his reasoning for issuing the variance. The Commissioner compared the cost-of-performance (COP) method of calculating the amount of Vodafone's business attributable to Tennessee with the primary-place-of-use (PPU) method utilized by Vodafone in its original tax returns for the Relevant Period. The variance letter explained that the PPU method utilized by Vodafone in its original tax returns for the Relevant Period was straightforward, and that method allowed the Commissioner to readily verify the underlying receipts supporting the taxpayer's return. Importantly, the Commissioner stated, the PPU methodology resulted in a calculation that fairly represented the extent of Vodafone's business in Tennessee because it treated as Tennessee receipts the payments that Tennessee customers made for Vodafone's cell phone services. In contrast, the letter claimed, the COP method as advocated by Vodafone was inordinately complex and not administrable because it left the Commissioner unable to independently verify the taxpayer's assertions as to the state in which most of its cost of performance took place. The Commissioner questioned Vodafone's calculation of its Tennessee taxes under the COP method, since Vodafone's calculations included in the denominator of the apportionment formula all of Vodafone's costs to all customers everywhere, rather than only the costs associated with its Tennessee customers. However, accepting *arguendo* Vodafone's calculations, the Commissioner stated, if Vodafone were permitted to use the COP method, it would take in millions of dollars in receipts from Tennessee customers free of Tennessee franchise and excise tax. Indeed, using the COP method, Vodafone would take in over $1.2 billion in receipts from Tennessee free of taxation in any state. Under these circumstances, the Commissioner concluded, calculating Vodafone's franchise and excise taxes by the COP

---

(3) The inclusion of one (1) or more additional apportionment formula factors that will fairly represent the taxpayer's business activity in this state;

(4) The use of any other method to source receipts for purposes of the receipts factor or factors of the apportionment formula numerator or numerators; or

(5) The employment of any other method to effectuate an equitable computation, allocation and apportionment of the taxpayer's net worth, as adjusted, that fairly represents the extent of the business entity's activities in Tennessee.

Tenn. Code Ann. § 67-4-2112(a) (2015).

6

methodology "would not fairly represent the extent of business activities conducted in Tennessee" by Vodafone.

For these reasons, the Commissioner's variance letter rejected Vodafone's proposed use of the COP methodology for calculating its franchise and excise taxes. Instead, the Commissioner required Vodafone to calculate its Tennessee receipts for the Relevant Period using the PPU method, that is, the Commissioner required Vodafone to include the sales receipts from Tennessee billing addresses in the numerator of the receipts factor of the apportionment formula.[8]  The net effect of the Commissioner's

---

[8] The Commissioner's variance letter stated in pertinent part:

On their original franchise/excise tax returns filed with this Department, the Taxpayers used the pay-per-use or primary-place-of-use ("PPU") methodology to determine the gross receipts to be included in the numerators of the gross receipts factors of each of their apportionment formulas. Under the PPU methodology the Taxpayers sourced their earnings according to the locations of their cellphone customers.

Now . . . the Taxpayers assert . . . that the numerator of each Taxpayer's gross receipts factor in its apportionment formula should be determined under the provisions of Tenn. Code Ann. §§ 67-4-2012(i) and 67-4-2111(i), sometimes referred to as the cost-of-performance ("COP") methodology.  Use of the so-called COP methodology, at least as the Taxpayers have calculated it, would result in a substantial reduction in the gross receipts that each Taxpayer would include in the numerator of the receipts factor of its apportionment formula for each tax period. As a result, there would be a substantial reduction in each Taxpayer's franchise/excise tax liability.

I have given careful study to information produced by the Taxpayers that shows the difference in the COP and PPU methodologies when applied. . . . The PPU methodology originally used by the Taxpayers sources receipts according to the places at which the Taxpayers' customers are located and where the cellphone services are provided. But the COP methodology proposed by the Taxpayers sources receipts according to the place where the taxpayers arguably incur the costs of providing services.

The PPU method is straightforward and conceptually satisfying in that it treats as Tennessee receipts the payments that Tennessee customers/residents make for cellphone services provided by the Taxpayers. In this context, it is not reasonable to say that receipts from a Tennessee customer should be attributed to another jurisdiction because, for example, a call that he or she made was routed through some facilities in other jurisdictions or more of the Taxpayers' general overhead costs are incurred in other jurisdictions than in Tennessee.

Under the PPU method, it is easy to determine the state to which receipts from services provided to the Taxpayers' cellphone customers should be attributed because a receipt from a customer residing in a particular state is attributed to that state. To verify whether a receipt has been correctly attributed to a particular state, it is only necessary to determine the state in which the cellphone customer from which the payment was received is located.

7

The COP method is not so straightforward because it sources receipts to the state where the greater proportion of the earnings-producing activity is performed, based on costs of performance. In the Taxpayers' particular situation, activities that produce earnings from providing cellphone service take place in multiple states. It may be a matter of judgment or opinion as to the particular state in which the greater proportion of the earnings-producing activities associated with a particular receipt are performed based on costs of performance. At best, in the Taxpayers' particular situation, calculation of receipts to be included in the numerators of their gross receipts apportionment factors would be extremely complex using the COP method that the Taxpayers propose.

Costs associated with the performance of a particular earnings producing activity that takes place across several states may, arguably, have been arbitrarily assigned by the Taxpayers to the various states in which the activity takes place. When attempting to verify whether a receipt has been correctly attributed to a particular state, the Department may find itself largely dependent on the opinions and judgments of the Taxpayers. . . .

I am aware of an October 30, 2009 memorandum prepared by [PwC] to explain the COP methodology that the Taxpayers proposed to employ . . . . [T]he Taxpayers' calculations under their COP methodology include their costs for rendering all of their services to their customers everywhere, rather than being limited to their costs for rendering services in Tennessee. While the latter would doubtless be a complex calculation, it may well be that a reliable calculation under the COP method would produce a far different result than the Taxpayers claim.

According to the [PwC] Memorandum, the states in which these Taxpayers had higher costs of performance than Tennessee were California, Georgia, and New Jersey, none of which follows a COP methodology. Because the statutes of some states in which Taxpayers do business do not employ a COP methodology, application of the COP method as calculated by the taxpayers would result in many millions of dollars of their earnings from Tennessee residents escaping their fair share of taxation in Tennessee or anywhere else. As calculated by the Taxpayers, application of the COP methodology would mean that the overwhelming majority of these Taxpayers' earnings would not be captured in any other state. According to information provided by the Taxpayers, the receipts that escape taxation in any state when the Taxpayers apply their calculation of the COP methodology to the years in litigation exceed $1 billion.

It is clear to me that application of the COP methodology when determining gross receipts to be included in the numerators of the Taxpayers' gross receipts factors in their apportionment formulas would not fairly represent the extent of business activities conducted in Tennessee by the Taxpayers. . . . Use of the COP methodology allows the Taxpayers . . . to derive substantial receipts from Tennessee markets without such receipts being accounted for in the Tennessee receipts factors of their franchise/excise tax apportionment formulas and without such receipts being recognized in other taxing jurisdictions.

Accordingly, I have decided to require a variance for the tax years under litigation and for all subsequent tax years pursuant to the authority granted me by Tenn. Code Ann. §§ 67-4-2014 and 67-4-2112.

Under the variance imposed, the Taxpayers will be required to determine the gross receipts to be included in the numerators of the apportionment formula gross receipts factors for

8

variance was to require Vodafone to calculate its taxes for the Relevant Period by the method Vodafone originally utilized in its tax return. Vodafone would not owe additional taxes, but it would also be due no refund of the franchise and excise taxes it had paid.

The imposition of the variance on Vodafone altered the focus of the litigation to include issues related to the variance. Perhaps not surprisingly, Vodafone questioned the propriety of the Commissioner's decision to impose a variance.

After that, the parties filed cross-motions for summary judgment on the questions related to the variance and also on the nexus issue, i.e., whether Vodafone had conducted business in Tennessee within the meaning of the franchise and excise tax statutes during the Relevant Period. In November 2012, the trial court granted summary judgment in favor of the Commissioner on the nexus issue, concluding that Vodafone had conducted business in Tennessee within the meaning of the franchise and excise tax statutes during the Relevant Period. It denied summary judgment on the parties' remaining issues, including the issue regarding the propriety of the Commissioner's decision to impose a variance.

## Trial Court Proceedings

The trial court conducted a bench trial in March 2013. The facts pertinent to the Commissioner's imposition of a variance were largely stipulated, and the evidence was presented through exhibits, affidavits, and deposition testimony. Both parties presented expert testimony on the question of whether the Commissioner abused his discretion by imposing a variance on Vodafone for the Relevant Period.

Vodafone presented expert testimony from John Swain, a law professor at Arizona Rogers School of Law since 2000, specializing in state and local taxation.[9] Mr. Swain explained that, in order to fend off federal intervention into the taxation of multistate businesses, most states—including Tennessee—adopted the Uniform Division of Income for Tax Purposes Act (UDITPA), entered into the Multistate Tax Compact (which

---

tax years in litigation and for all subsequent tax years by using the PPU methodology that they originally used when filing their franchise/excise tax returns for the tax years in litigation. I believe that use of the PPU method is necessary to fairly represent the extent of the business activities that the Taxpayers conduct in Tennessee through their direct and indirect general partnership interests in Cellco Partnership.

Commissioner's Notice of Imposition of Franchise/Excise Tax Variances to Vodafone, May 21, 2010.

[9] Prior to becoming a law professor, Mr. Swain practiced law specializing in state and local taxation. His curriculum vitae lists numerous published writings in the field of state and local taxation.

incorporated the terms of UDITPA), and created a governing body, the Multistate Tax Commission. UDITPA provides a set of uniform rules for allocating and apportioning the income of multistate businesses. The states that adopted UDITPA mostly adhere to the UDITPA apportionment formula, under which receipts from the sale of tangible personal property are attributed to the state to which the property is shipped (PPU method), but receipts from the sale of services or intangibles are attributed to the state in which the majority of the costs of performance occur (COP method). UDITPA provides a relief mechanism for states to depart from UDITPA's allocation rules if they "do not fairly represent the extent of the taxpayer's business activity in [the] state."[10]

Mr. Swain opined that the Commissioner's variance in this case was contrary to a regulation proposed by the Multistate Tax Commission and adopted by Tennessee (Tenn. Comp. R. & Regs. 1320-06-01-.35(1)(a)(1)) which indicates that a state will depart from the UDITPA apportionment formula "only in specific cases where unusual fact situations (which ordinarily will be unique and non-recurring) produce incongruous results under the [UDITPA] apportionment and allocation provisions. . . ." Mr. Swain asserted that the Commissioner abused his discretion in imposing the variance because there were no unusual circumstances specific to Vodafone that would not apply equally to all providers of telecommunications services. He claimed that use of a variance "to prevent so-called 'nowhere income' frustrates UDITPA's goals of uniformity and 100% taxation because it would allow an individual state to change its apportionment methodology on a case-by-case basis and . . . distort the obviously intended results of the application of the statutory formula. . . ."

Briefly opining on whether application of the COP method resulted in a fair representation of the extent of Vodafone's business activity in Tennessee, Mr. Swain claimed that it "reaches a fair result when applied to Vodafone by taking into account all of the costs that are related to providing Verizon Wireless services." Thus, Mr. Swain's opinion addressed the fairness of the denominator, i.e. the taxpayer's costs, in the apportionment formula using the COP methodology, but not the numerator. He took the position that the exclusion of $1.2 billion in receipts for Vodafone's wireless services to Tennessee customers did not render the overall result an unfair representation of the extent of Vodafone's business activity in Tennessee because that was the result from application of the statutory formula in the Tennessee statute.[11]

---

[10] As noted above, in Tennessee, this is termed a "variance."

[11] Asked about allowing 89% of Vodafone's sales receipts to be "lost" under the COP methodology urged by Vodafone in its refund request, Mr. Swain responded: "[N]othing is lost to Tennessee. What other states are choosing to . . . pick up . . . this 'lost' 89% is a question of their law and their choosing to cede their taxing authority in some way under UDITPA, because they aren't applying the uniform UDITPA rule and Tennessee is. . . . I think that's a question for the other states to introspect on and decide what they want to do or Tennessee could rewrite its statute."

10

Mr. Swain agreed that the drafters of UDITPA, first proposed in the 1950s, did not anticipate the multistate wireless telecommunications industry. He also conceded that he had made assumptions in his expert report regarding other businesses in the wireless telecommunications industry but had no knowledge of the particulars of their businesses, how they reported their receipts to the State of Tennessee, or whether the Commissioner had imposed a variance on them.

The Department presented expert testimony from Benjamin F. Miller. For 38 years, Mr. Miller worked for the Franchise Tax Board of California. While there, he served as its Counsel for Multistate Tax Affairs and oversaw the organization's handling of petitions filed pursuant to Section 18 of California's UDITPA statutes. He also served as the Director of the Multistate Tax Bureau in the Legal Division. Mr. Miller was the principle draftsperson for a number of California regulations implementing UDITPA, including Section 18 regulations. He also served in several roles as California's representative to the Multistate Tax Commission. Mr. Miller has advised the United States Congress and the California legislature on taxation matters and has served as a tax consultant for several entities, including the Internal Revenue Service, the United States Air Force, and several states.

In his overview of UDITPA, Mr. Miller noted two principles behind the Act. The first was to obtain uniformity in state rules of allocation and apportionment so that no income would be assigned to more than one State. Ideally, if all states applied the same rules, "no state would include in the numerator of its apportionment factor an item that was included in the numerator of an apportionment factor of another state." The second UDITPA principle was that no income should escape taxation. Mr. Miller said that this is sometimes referred to as "nowhere income."

He noted that UDITPA included a relief provision, Section 18, which was adopted by Tennessee. This provision allows for deviation from the standard apportionment rules either upon petition by the taxpayer or as required by the State's tax administrator, here, the Commissioner.[12] He outlined a "series of steps" to be taken under Section 18:

> First, the initial step is to demonstrate that the application of the standard
> rules does not fairly reflect the taxpayer's business activity in the state. In

---

[12] Mr. Miller pointed out that when Tennessee adopted its version of Section 18 in 1999, giving the Commissioner the discretion to grant or impose a variance, it added that the Commissioner was permitted "[t]he use of any other method to source receipts for purposes of the receipts factor or factors of the apportionment formula." Mr. Miller commented that "[i]ncluding this language in Tennessee's equivalent of Section 18 is evidence that the Tennessee General Assembly . . . recognized that the sourcing rules for receipts deserve special consideration."

the circumstances of this case this means that the Section 17 [the standard PPU methodology] assignment of receipts on the basis of income producing activity does not fairly reflect the taxpayer's activities in Tennessee. Second, the tax administrator [the Commissioner] determines the variance. Third, the tax administrator's determination is subject to review under an abuse of discretion standard.

Mr. Miller pointed out that the primary draftsman of UDITPA, William Pierce,[13] commented that the rule for assignment of receipts from services and intangibles could in many cases "yield results that were contrary to the fundamental goals of UDITPA." For this reason, Mr. Miller said, Mr. Pierce suggested that it was particularly likely that it would be necessary for state tax administrators to invoke Section 18 and deviate from the standard methodology with respect to receipts for services and intangibles.

Mr. Miller agreed with the Commissioner's assessment that use of the COP methodology advocated by Vodafone did not fairly reflect the extent of Vodafone's business activity in Tennessee. He noted that Vodafone had made no allegation that the PPU method it used in its original tax return resulted in duplicative taxation. In contrast, he said, use of the COP method proposed by Vodafone "would result in none of the Tennessee sales being attributed to any state and would result in a substantial portion of their income escaping any taxation."[14] Both of these consequences, Mr. Miller asserted, "violate fundamental principles of UDITPA."

Mr. Miller opined that the PPU method in the Commissioner's variance letter was reasonable. He noted that, for the tax returns for the Relevant Period, Vodafone assigned its Tennessee sales according to the billing address of the customers, the method chosen by the Commissioner in his variance. This was evidence, Mr. Miller said, that Vodafone did not at the time believe that this method unfairly represented their business activities in Tennessee.

Mr. Miller disputed Vodafone's characterization of the Commissioner's variance as retroactive. He pointed out that Tennessee accepted Vodafone's tax returns as filed and Vodafone later filed claims for refund. This was the first point in time that the Commissioner had occasion to consider the methodology sought by Vodafone. For this

---

[13] Mr. Pierce is sometimes referred to as the "father" of UDITPA. See, e.g., BellSouth Advert. & Publ'g Corp. v. Chumley, 308 S.W.3d 350, 365 (Tenn. Ct. App. 2009).

[14] Mr. Miller also asserted that the COP method advocated by Vodafone was not administrable because it could not be audited by the State. He noted that Vodafone's response to interrogatories indicated that the information on which Vodafone relied to prepare the COP analysis was in the possession of Verizon Wireless and was not in the possession or control of the taxpayer Vodafone.

12

reason, Mr. Miller argued, the Commissioner's decision to impose a variance was not retroactive.

In cross-examining Mr. Miller, Vodafone's questions focused on whether, even if the COP methodology in existing Tennessee statutes were inappropriate for wireless telecommunications providers such as Vodafone, the Commissioner should promulgate regulations or seek to modify the statute, and whether his imposition of a variance on Vodafone was inconsistent with legislative intent behind UDITPA. In response, Mr. Miller said initially: "One of the problems which I think Section 18 addresses is the fact that you see these things sometimes the first time in filing a return or through a claim for refund, . . . and it's only then that you become aware that you have an issue . . . that may be unique to the taxpayer." He testified further:

> The intent of the legislature is represented [in] a variety of sections [in UDITPA]. One of the sections which they adopted was Section 18. Section 18 expresses the intent of the legislature to allow the Commissioner to vary from the standard formula.
>
> …
>
> The point is, until the Commissioner is aware that there's some issue which has to be addressed, that there may be some unfair refle[ct]ion [of a taxpayer's business in the state], they're not going to do this. In the context of this case, it was a change in a filing position by the taxpayer which raised this issue up to the Commissioner's attention. It was only when he looked at it and addressed the claim to do it under cost of performance methodology, which was not used previously, that he decided it was a variance.
>
> That's sort of what Section 18, in some respects, talks about. I mean, you're dealing with . . . an individual situation. If that individual situation turns out to be something which has widespread application, then you're in a situation where you're probably going to go to a regulation or a statute, so you don't have to address it on an individual basis.

Thus, Mr. Miller testified that Section 18 was intended to allow the Commissioner to vary from the standard formula or methodology for an individual taxpayer when a problem first came to his attention, through an action such as a claim for refund, indicating that the standard methodology or formula did not fairly reflect that taxpayer's business activity in the state. The imposition of a variance on that individual taxpayer could then be followed by efforts to promulgate regulations or modify the statute if the problem appeared to have "widespread application."

13

In March 2013, the trial court filed a comprehensive memorandum opinion, finding in favor of the Commissioner. At the outset, the trial court evaluated the COP methodology advocated by Vodafone and its effect on Vodafone's franchise and excise taxes. If Vodafone were permitted to use the COP methodology, the trial court noted, the numerator of the statutory apportionment formula would fall by over $1.2 billion, "from $1,357,566,794 to $150,896,965, an 89% difference" from the numerator utilized by Vodafone in its original tax return.[15]

The trial court outlined the reasons given by the Commissioner for concluding that the COP methodology did not result in a fair representation of Vodafone's business activity in Tennessee and for imposing a variance on Vodafone, as set forth in the commissioner's variance letter. It sorted through the evidence and reviewed the expert testimony given by Mr. Swain for Vodafone and by Mr. Miller for the Department. Citing the Court of Appeals' decision in BellSouth Advertising & Publishing Corp. v. Chumley, 308 S.W.3d 350 (Tenn. Ct. App. 2009) [hereinafter BAPCO], the trial court summarized the pertinent statutes, noting that the Commissioner may issue a variance if application of the statutory formula would yield a result that does not "fairly represent the extent of the taxpayer's business activity in Tennessee." It observed that the Department's regulation stated that such a variance is permitted "only in limited and specific cases" in which "unusual fact situations . . . produce incongruous results." It noted that the regulation added parenthetically that such cases are "ordinarily . . . unique and nonrecurring," and commented that the BAPCO Court had held that the "ordinarily" qualifier permitted the Commissioner to issue a variance in circumstances that were not "unique and nonrecurring."

Addressing these statutory and regulatory standards, the trial court held that the Commissioner had met his burden of proving that the variance imposed on Vodafone was reasonable. It first held that the Commissioner was reasonable in concluding that the COP methodology did not fairly reflect the extent of Vodafone's business activity in Tennessee. It then addressed Vodafone's argument that the issuance of the variance was contrary to the Department's regulations:

> As far as the Court can determine, the Commissioner has not yet issued additional variances that would begin to show a trend toward a general application of his rationale to other companies that generate receipts in Tennessee, but incur most of their costs elsewhere. The fact that the Commissioner's decision and rationale could theoretically be applied in a more sweeping fashion to other companies and industries does not

---

[15] The trial court observed that Vodafone had filed refund claims based on a similar cost-of-performance theory in eleven states other than Tennessee.

invalidate the variance for two basic reasons. First, the variance, by its terms, only applies to Vodafone. If the Commissioner begin[s] to issue variances that apply to other companies using the same rationale, those decisions will have to be viewed on a case-by-case basis in light of a pattern that can be brought to a court's attention. Secondly, . . . the statutory and regulatory scheme applicable to variances anticipates that certain types of businesses, not just an isolated wholly unique circumstance, might properly trigger examination under Commissioner's variance authority. . . .

…

Vodafone relies heavily on the language of the regulation. Contrary to Vodafone's assertions, the Court concludes that the Commissioner reacted to Vodafone's "limited and specific" situation. It is an unusual situation given Vodafone's structure, its tax history in Tennessee, and the fact that a substantial percentage of its previously taxable income was no longer being taxed under the cost-of-performance approach. It would be an incongruous result for Vodafone to use the cost-of-performance approach as it proposed to use it under the circumstances of this case, especially given the statutory standard which identifies the taxpayer's business activity in Tennessee as the focal point.

Thus, the trial court held that the variance was imposed in a limited and specific case in which departure from the statutory formula was warranted. The fact that the Commissioner could "theoretically" apply the same rationale to other telecommunications businesses did not undermine the variance in this case because there was no proof that it had been applied to other taxpayers. Vodafone's situation was unusual, the trial court held, in part because of Vodafone's "tax history in Tennessee."

In short, the trial court agreed with Mr. Miller's opinion that the Commissioner was reasonable and correct in concluding that the COP methodology did not fairly represent the extent of Vodafone's business activity in Tennessee. It found no factual basis in the record for Mr. Swain's assertion that the Commissioner's variance was inconsistent with the Department's regulations. The trial court concluded that the Commissioner's decision to issue the variance comported with the regulations and was reasonable. It held in favor of the Commissioner, awarded the Department attorney fees under Tennessee Code Annotated § 67-1-1803(d), and assessed costs against Vodafone. Vodafone appealed.

**Court of Appeals**

In Vodafone's appeal, it argued that sections 67-4-2012(i)(2) and 67-4-2111(i)(2) of the Tennessee Code Annotated expressly required Vodafone to source its receipts for

telecommunications services based on the "cost of performance" methodology. Vodafone Ams. Holdings, Inc., 2014 WL 2895900, at *8.  Under this method, Vodafone asserted, receipts for services are sourced, on an "all-or-nothing basis," to the single state in which the majority of activities associated with the services are performed, i.e., where the majority of the costs are incurred.  Id.  Citing the parties' stipulation for purposes of appeal that the great majority of its costs of performance occurred in a state other than Tennessee, Vodafone contended that no receipts from its telecommunications services, "not even those attributable to customers with Tennessee billing addresses," could be sourced to Tennessee. Id.  It contended that the Commissioner's imposition of a variance requiring a different methodology was contrary to the intent of the legislature when it enacted the statutes, inconsistent with the Department's own regulations regarding such variances, and ultimately an abuse of the Commissioner's discretion.  Id.

The Court of Appeals affirmed in a split decision. After a comprehensive review of the statutory scheme for franchise and excise taxes and for the Commissioner's issuance of a variance, the majority characterized the "determinative question" as "whether the Commissioner acted within his discretion when he issued the variance." Id. at *15.  It looked first at the Commissioner's conclusion that the apportionment under the statutory method urged by Vodafone does not fairly represent the extent of Vodafone's business in Tennessee.  The majority noted that, under the method urged by Vodafone, its sales factor would fall from approximately $1.3 billion to approximately $150 million, a decrease of 89%.  Citing a similar factual situation in the BAPCO case, the majority easily concluded that the Commissioner had exercised reasonable discretion in concluding that the facts and circumstances justified departure from the statutory formula.  Id. (citing BAPCO, 308 S.W.3d at 366-67).

The Court of Appeals then noted the Department's regulation on variances and described it as containing "additional standards to consider for an alternative method" for calculating a taxpayer's franchise and excise taxes. The Court of Appeals summarized the regulation as indicating that an alternative methodology "may be used in limited and specific cases involving unusual fact situations which are ordinarily unique and nonrecurring when the statutory formula produces incongruous results." Id. (citing Tenn. Comp. R. & Regs. 1320-06-01-.35(1)(a)(4)).  It held that the Commissioner's variance was not inconsistent with the regulation:

> Is this a limited and specific case? Yes. While it may provide a precedent for other similarly situated companies in the future, those similarly situated companies would be a very small part of all the entities that must pay the tax. The variance applied here will not lead to an evisceration of the statutory formula. . . .
>
> Is it an unusual fact situation? Yes. The deposition testimony of Professor John A. Swain indicates that the drafters of the UDITPA likely

16

did not anticipate the wireless industry. Again, if the variance is precedent for other entities, there would not be many.

Is it ordinarily unique and nonrecurring? While it may be unique to this taxpayer or to this industry, it does not appear to be nonrecurring. However, the use of the word "ordinarily" indicates that this is not a hard and fast requirement. In addition, Tenn. Code Ann. § 67-4-2014(d) states that, "When another method of tax computation, allocation or apportionment as set out above has once been established, it shall continue in effect so long as the circumstances justifying the variation remain substantially unchanged, or until changed or discontinued by the department, whichever occurs first." Clearly, recurrence was envisioned by the statute.

Id. at *16. Thus, the majority concluded that the subject variance was applied in a limited and specific case, and Vodafone's fact situation was unusual and not contemplated by the UDITPA drafters, as conceded by Vodafone's expert witness. It held that the circumstances were unique to Vodafone or to the telecommunications industry, but were not nonrecurring. However, it observed that the word "ordinarily" was used in the regulation to modify "nonrecurring" and that the statute expressly contemplated a variance that would continue indefinitely. The majority also found that there would be an "incongruous result" under the statutorily prescribed method:

Is the result under the statute incongruous? . . . It has been suggested that the lack of taxation under the statutory formula is a policy choice and what other states do is irrelevant—that lack of taxation in other jurisdictions is not grounds to tax here. However, the Commissioner's authority to issue a variance is also a policy choice made by the legislature. It applies when the statutory formula "misfires." Such instances were anticipated. Because it applies when the statutory formula does not "fairly represent the extent of the taxpayer's business activity in this state," the variance can apply where the state is entitled to receive more taxes as well as a situation where the taxpayer is entitled to pay less taxes. The fact that other states do not tax the Tennessee receipts indicates that it is not unfair for Tennessee to do so. Furthermore, it is not reasonable to allow the company's Tennessee receipts to remain untaxed just because a call may be routed through facilities in other jurisdictions. Such a result is not consistent with the principles adopted in our statutes on taxation for the privilege of doing business in this state. Thus, there is "clear and cogent evidence that peculiar or unusual circumstances exist which would cause application of the said statutory provisions to work a hardship or injustice." Tenn. Comp. R. & Regs. 1320-6-1-.35(1)(c).

17

Id. at *16 (footnotes omitted). In short, the majority held that the fact that Vodafone's Tennessee service receipts would remain entirely untaxed under the statutory methodology was an "incongruous result." Id. The majority asserted: "Such a result is not consistent with the principles adopted in our statutes on taxation for the privilege of doing business in this state." Id. Consequently, the majority held that the variance was consistent with the Department's regulations and within the discretion granted to the Commissioner by the statute, so it affirmed the trial court's decision upholding the imposition of a variance on Vodafone. Id. at *17.

The dissent was of the opinion that the Commissioner's authority to issue a variance was limited by the Department's regulations and believed that he had exceeded his authority in issuing the variance. Vodafone Ams. Holdings, Inc., 2014 WL 2895900, at *17 (Clement, J. dissenting). The dissent relied on Kellogg Co. v. Olsen, 675 S.W.2d 707 (Tenn. 1984), and Am. Tel. & Tel. Co. v. Huddleston, 880 S.W.2d 682 (Tenn. Ct. App. 1994), discussed infra. It distinguished the BAPCO decision cited by the majority,[16] and commented that prior variance cases had often involved a taxpayer's claim for relief on constitutional grounds. Id. at *23.

We granted Vodafone's request for permission to appeal to this Court.

## ISSUES ON APPEAL

On appeal, the issues raised by Vodafone all concern the Commissioner's imposition of a variance:

1. Whether the Commissioner of Revenue abused his discretion under Tenn. Code Ann. §§ 67-4-2014(a) and 67-4-2112(a) by imposing a variance that requires Plaintiffs to use a sourcing methodology directly contrary to the cost of performance methodology chosen by the General Assembly when application of the statutory methodology to Plaintiffs' business reaches the precise result the General Assembly intended when adopting that methodology.

2. Whether the Commissioner of Revenue abused his discretion under Tenn. Code Ann. §§ 67-4-2014(a) and 67-4-2112(a) by imposing a variance in complete absence of the "unusual circumstances" and "incongruous result" demanded by applicable law.

---

[16] The dissent distinguished BAPCO on the basis that, in that case, the revenue from the taxpayer's service, advertising, was derived when the tangible property, telephone books, were distributed in Tennessee. Vodafone Ams. Holdings, Inc., 2014 WL 2895900, at *74.

18

3. Whether the Commissioner of Revenue violated the separation of powers required by the Constitution by imposing a variance on Plaintiffs in circumstances where application of the franchise and excise tax apportionment statutes reaches the precise result the General Assembly intended when adopting those statutes.

We note that Vodafone asks this Court to consider whether the variance imposed by the Commissioner "violated the separation of powers required by the Constitution," but it raised no such issue in the lower courts. It is axiomatic that a party may not raise an issue on appeal that was not first raised in the trial court. Powell v. Cmty. Health Sys., Inc., 312 S.W.3d 496, 511 (Tenn. 2010). Under these circumstances, Vodafone has waived any issue regarding whether the variance contravenes the federal or state constitution, and we decline to address it. Accordingly, we consider only whether the Commissioner abused his discretion by imposing the variance at issue in this case.

## ANALYSIS

On appeal, Vodafone makes much the same arguments it made to the trial court and to the Court of Appeals. It argues that Tennessee franchise and excise tax statutes mandate that the receipts from Vodafone's wireless telecommunications services be sourced by the cost of performance methodology set out in Tennessee Code Annotated sections 67-4-2012(i) and 67-4-2111(i) and there is a strong presumption in favor of the standard apportionment formula. It contends that the Commissioner has only limited authority to impose a variance, and it insists that the Commissioner exceeded his authority in this case by imposing a variance requiring Vodafone to use the "market-based" sourcing method it used in its original tax returns for the Relevant Period. Vodafone argues that the Department's own regulations circumscribe the Commissioner's authority to impose a variance, stating that a variance may be imposed only "in limited and specific cases," to address "incongruous results" not intended by the legislature, that arise out of "unusual fact situations" that are unique to the taxpayer and nonrecurring. See Tenn. Comp. R. & Regs. 1320-06-01-.35. Vodafone maintains that the variance issued in this case contravenes the legislature's exclusive authority to enact laws and impose taxes and that allowing the variance to stand would create chaos for taxpayers who rely on the predictability of the franchise and excise tax statutes.[17]

---

[17] Amicus Curiae the Council on State Taxation supports Vodafone's position and further argues that upholding the variance in this case would effectively allow the Commissioner to make ad hoc determinations of how a taxpayer's income should be apportioned. It contends that the rulings by the lower courts are contrary to the express will of the General Assembly and foster uncertainty for service industries whose costs of performance are incurred largely in other states.

Amicus Curiae the Institute for Professionals in Taxation also supports Vodafone's position. It argues that the Court of Appeals' decision will negatively impact the manner in which Tennessee

19

For purposes of this appeal, it is undisputed that the COP methodology for calculating franchise and excise taxes that Vodafone proposes in its request for refund for the Relevant Period is consistent with the methodology set forth in Tennessee's franchise and excise tax statutes, Tennessee Code Annotated §§ 67-4-2012(i)(2) and 67-4-2111(i)(2). Vodafone claims that the majority of earnings-producing activity required for it to provide wireless and data services to Tennessee customers occurs outside of Tennessee in New Jersey, so the entirety of its receipts for providing those services would not be included in the sales factor for the apportionment formula using the COP methodology. Although the Commissioner disputes this assertion, the issue is reserved, so we treat it as undisputed for the purposes of this appeal.[18] The parties agree that removal of Vodafone's service receipts from the apportionment formula reduces the sales factor in Vodafone's apportionment formula from approximately $1.3 billion to approximately $150 million, a decrease of approximately 89%.

It is also undisputed on appeal that the PPU methodology for calculating franchise and excise taxes chosen by the Commissioner in the subject variance is consistent with the methodology used by Vodafone in its original tax returns for the Relevant Period. Consequently, if the Commissioner's variance is upheld on appeal, Vodafone would essentially owe no additional franchise and excise taxes for the Relevant Period but also would not be entitled to the requested refund.

We review the Commissioner's decision to impose a variance for an abuse of his discretion. See BellSouth Advert. & Publ'g. Corp., 308 S.W.3d at 365; Sherwin-Williams Co. v. Johnson, 989 S.W.2d 710, 715 (Tenn. Ct. App. 1998); Am. Tel. & Tel. Co. v. Huddleston, 880 S.W.2d at 691 [hereinafter AT&T]. Adapting the abuse of discretion standard as applied to a trial court's decision, "the abuse of discretion standard of review envisions a less rigorous review" of the Commissioner's decision "and a

administers income tax for taxpayers represented by its members and also the manner in which other states administer their tax laws. It characterizes the Commissioner's variance as an "extreme step" and contends that allowing it to stand would create uncertainty for multistate taxpayers.

Amicus Curiae the Tennessee Cable Telecommunications Association echoes Vodafone's arguments and emphasizes the need for certainty and predictability in the application of Tennessee franchise and excise tax laws. It also contends that the Court of Appeals' majority opinion ignores the fact that existing statutes can apply to emerging industries and technology, citing Prodigy Servs. Corp. v. Johnson, 125 S.W.3d 413, 417 (Tenn. Ct. App. 2013).

[18] The Commissioner disputes the reliability of the PwC study, but at this juncture, the facts and analysis necessary to determine the location of Vodafone's costs of performance have not been presented to the trial court, so that issue is reserved. He also disputes Vodafone's claim that the receipts would be assigned to New Jersey, but the parties have reserved that issue for further adjudication, if needed. The Commissioner also disputes Vodafone's use of all of its costs for customers everywhere in the denominator of the apportionment formula, but has reserved that issue for later proceedings, if needed.

decreased likelihood that the decision will be reversed" upon judicial review. Lee Med., Inc. v. Beecher, 312 S.W.3d 515, 524 (Tenn. 2010) (citing Beard v. Bd. of Prof'l Responsibility, 288 S.W.3d 838, 860 (Tenn. 2009); State ex rel. Jones v. Looper, 86 S.W.3d 189, 193 (Tenn. Ct. App. 2000)). "It reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives." Id. (citing Overstreet v. Shoney's, Inc., 4 S.W.3d 694, 708 (Tenn. Ct. App. 1999)). The abuse of discretion standard of review "does not immunize" the Commissioner's decision from meaningful judicial scrutiny, but it also does not permit the reviewing court to second-guess the Commissioner or substitute the reviewing court's discretion for that of the Commissioner. Id. (citing Boyd v. Comdata Network, Inc., 88 S.W.3d 203, 211 (Tenn. Ct. App. 2002); White v. Vanderbilt Univ., 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999); Henry v. Goins, 104 S.W.3d 475, 479 (Tenn. 2003); Myint v. Allstate Ins. Co., 970 S.W.2d 920, 927 (Tenn. 1998)).

"Discretionary decisions must take the applicable law and the relevant facts into account." Id. (citing Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth., 249 S.W.3d 346, 358 (Tenn. 2008); Ballard v. Herzke, 924 S.W.2d 652, 661 (Tenn. 1996)). We review the Commissioner's discretionary decision "to determine (1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the [Commissioner] properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the [Commissioner's] decision was within the range of acceptable alternative dispositions." Id. (citing Flautt & Mann v. Council of Memphis, 285 S.W.3d 856, 872-73 (Tenn. Ct. App. 2008)).

To review the Commissioner's discretionary decision in this case, we will first review the background of the Tennessee franchise and excise tax statutes at issue and the concomitant regulation. Then, in light of the standards set forth in the statutes and the regulation, we look at whether the factual basis for the Commissioner's decision is properly supported in the record and whether the Commissioner identified and applied those standards. Finally, we consider whether the variance was within the range of acceptable alternative decisions, to determine overall whether the Commissioner's imposition of a variance constituted an abuse of his discretion.

**Background**

We will briefly review the background of Tennessee's franchise and excise tax statues and regulations. As noted by the Court of Appeals below, Tennessee's corporate excise tax, Tenn. Code Ann. § 67-4-2001 et seq., and its franchise tax, Tenn. Code Ann. § 67-4-2101 et seq., are both privilege taxes, levied upon corporations for the privilege of doing business in this state. See Federated Stores Realty, Inc. v. Huddleston, 852 S.W.2d 206, 208 (Tenn. 1992); First Am. Nat'l Bank v. Olsen, 751 S. W. 2d 417, 421 (Tenn. 1987); Cook Exp. Corp. v. King, 652 S.W.2d 896, 900 (Tenn. 1983); BellSouth Advert. & Publ'g Corp., 308 S.W.3d at 350. The excise tax is based on the taxpayer's "net

earnings," while the franchise tax is based on the taxpayer's "net worth." See Tenn. Code Ann. § 67-4-2007 (excise tax); Tenn. Code Ann. § 67-4-2106 (franchise tax). Though the excise and franchise taxes are separate and distinct, this Court has recognized that the "Legislature clearly intends that these taxes be taken in tandem and construed together as one scheme of taxation." Federated Stores Realty, Inc., 852 S.W.2d at 208 (quoting First Am. Nat'l Bank, 751 S.W.2d at 421). Consequently, our analysis considers them together.

In a nod to States' rights to enact tax laws "based on considerations unique to each State," the U.S. Supreme Court has held that the federal constitution places few restraints on States' choice of method for taxing multistate corporations. Moorman Mfg. Co. v. Bair, 437 U.S. 267, 279 (1978). The Court recognized that Congress could enact laws requiring States to follow uniform rules for dividing the income of multistate corporations for tax purposes. Absent such a federal law, however, "States have wide latitude in the selection of apportionment formulas and . . . a formula-produced assessment will only be disturbed when the taxpayer has proved by 'clear and cogent evidence' that the income attributed to the State is in fact 'out of all appropriate proportion to the business transacted . . . in that State,' or has 'led to a grossly distorted result.'" Moorman Mfg., 437 U.S. at 274 (internal citations omitted). Under this principle, States may tax "an apportionable share of the multistate business carried on in part in the taxing State." Allied-Signal, Inc. v. Dir., Div. of Taxation, 504 U.S. 768, 778 (1992).

As discussed more fully below, Tennessee's franchise and excise tax statutes, including its apportionment formula and variance provisions, are based on a model law. Pertinent to the issues on appeal, it is helpful to briefly review the history of Tennessee's franchise and excise tax statutes and the model law on which they are based.

Following the 1956 codification of the Tennessee Code,[19] it became clear to lawmakers nationwide that uniformity was needed in the area of taxation of multistate corporations. Joe Huddleston, Shirley Sicilian, Joe Huddleston & Shirley Sicilian, The Project to Revise UDITPA 4 (2009), http://www.mtc.gov/uploadedFiles/Multistate_Tax_Commission/Uniformity/Minutes/Th e%20Project%20to%20Revise%20UDITPA.pdf (last visited March 8, 2016) ("One commentator wrote in 1934 that 'the tax methods are almost as numerous as the taxing jurisdictions.'") (footnote citations omitted). To head off federal legislation regulating states' allocation of the income of multistate corporations, the National Conference of

---

[19] The Tennessee Code Annotated, enacted as chapter 6 of the Public Acts of 1955, is the third complete code enacted into law in the history of the state, and the first official annotated code, and was effective in 1956. The Publishers, Preface, Tennessee Code Annotated, Vol. 1 (1955).

Commissioners on Uniform State Laws drafted a model law, the Uniform Division of Income for Tax Purposes Act (UDITPA). Blue Bell Creameries, LP v. Roberts, 333 S.W.3d 59, 65 (Tenn. 2011); see also Microsoft Corp. v. Franchise Tax Bd., 139 P.3d 1169, 1171 (2006) (citing Frank M. Keesling, The Combined Report and Uniformity in Allocation Practices, Address at the Annual Meeting of the Multistate Tax Commission (June 25, 1974), *in* Seventh Annual Report Multistate Tax Commission, Jan. 31, 1975, at 34). UDITPA was first proposed in 1957 by its primary drafter, Professor William J. Pierce of the University of Michigan Law School. See Huddleston & Sicilian, supra, at 5; see also Arthur D. Lyons, Jr., The Uniform Division of Income for Tax Purposes Act, 19 Ohio St. L.J. 41 (1958). UDITPA's purpose was "to bring about uniformity among the states in taxing the income of multistate corporations" in order to "avoid[] potential duplication of taxing the same income and . . . provid[e] a fair means of assigning taxable income among the states." M. Bernadette Welch, Annotation, Construction and Application of [UDITPA] -- Availability of Relief from Standard Apportionment Formula and Other Issues, 81 A.L.R.6th 97, § 2 (2013). Thus, UDITPA was intended to assure that, for states that tax the net income of multistate corporations, "100 per cent of income, and no more or no less, would be taxed." William J. Pierce, The Uniform Division of Income for State Tax Purposes, 35 Taxes 747, 748 (1957).

To further its goals of assuring fair apportionment among states and taxation of neither more nor less than 100% of the net income of multistate corporations, UDITPA uses an apportionment formula. See BAPCO, 308 S.W.3d at 365; see also Donovan Constr. Co. v. Mich. Dep't of Treasury, 337 N.W.2d 297, 300 (Mich. Ct. App. 1983); Twentieth Century-Fox Film Corp. v. Dep't of Revenue, 700 P.2d 1035, 1038 (Or. 1985). Apportionment "'takes all the corporate income and divides it among all jurisdictions where business is done, based on a formula that takes property, payroll, and sales into account.'" AT&T, 880 S.W.2d at 689 (quoting Holiday Inns, Inc. v. Olsen, 692 S.W.2d 850, 852 (Tenn. 1985)). "Apportionment is designed 'to obtain a rough approximation of the corporate income that is reasonably related to the activities conducted within the taxing State.'" Blue Bell Creameries, LP, 333 S.W.3d at 65 (quoting Exxon Corp. v. Wisc. Dep't of Revenue, 447 U.S. 207, 223 (1980)).

Since its introduction, UDITPA has been adopted, in whole or in part, by more than thirty states.[20] Huddleston & Sicilian, supra, at 6 nn. 14 & 18 (citing Commerce Clearing House, ¶ 11-520, May 27, 2008) (identifying 36 states); *cf.* 81 A.L.R.6th 97, §2 (originally published in 2013) (counting 34 states). Tennessee adopted UDITPA in

---

[20] Sources vary as to the exact number. This may be in part because some states later chose to withdraw adoption of UDITPA.

1976.[21] <u>Blue Bell Creameries, LP</u>, 333 S.W.3d at 65; <u>Sherwin-Williams Co.</u>, 989 S.W.2d at 711. Pursuant to UDITPA, the Tennessee franchise and excise tax statutes in effect during the Relevant Period continued to use an apportionment formula.[22] <u>See</u> Tenn. Code Ann. § 67-4-2012 (excise tax apportionment formula);[23] Tenn. Code Ann. § 67-4-2111 (franchise tax apportionment formula).[24]

---

[21] In the legislative discussion on the UDITPA legislation, Representative John Bragg reported that the Tennessee franchise and excise tax formula in existence at that time was different from that used by any other Multistate Tax Compact state, that some form of UDITPA was being used in thirty-seven states in the nation, and that Tennessee was effectively collecting only 5.6% of the excise tax instead of the 6% statutory amount. He opined that the low excise tax collection rate was due in part to creative corporate structuring. <u>See</u> <u>Debate on H.B. 1634 Before the House</u>, 79th Gen. Assemb., Reg. Sess. (Tenn. Mar. 9, 1976) (statements by Rep. Bragg).

[22] The general formula for calculating the apportionment for either the franchise or excise tax is in the form of an equation that includes fractions:

$$\frac{\text{Property} + \text{Payroll} + (\text{Sales Receipts} \times 2)}{4}$$
= taxpayer's total net earnings or net worth subject to tax in Tennessee

Each factor in the formula -- property, payroll and sales receipts -- is a separate fraction. The factor at issue in this case is the sales receipts factor, which is double-weighted in the formula. The Department's regulations address the sales receipts factor as it pertains to receipts derived from services. <u>See</u> Tenn. Comp. R. & Regs. R. 1320-6-1-.34(1)-(3). The sales receipts factor is calculated by using the taxpayer's Tennessee sales as the numerator, and the denominator is the taxpayer's overall sales:

$$\frac{\text{Tennessee sales receipts}}{\text{Overall sales}}$$
= Sales receipts factor

In his appellate brief, the Commissioner explains that the formulas are used to determine the appropriate tax as follows:

> The resulting fraction from each factor [property, payroll, and sales receipts] is converted to a percentage and multiplied by the taxpayer's business earnings to determine the amount of business earnings apportioned to Tennessee. Tenn. Code. Ann. § 67-4-2012(a). The apportioned amount (plus non-business earnings, if any) is multiplied by the tax rate to determine the excise tax owed to Tennessee. Tenn. Code Ann. §§ 67-4-2007 and -2106.

[23] Tenn. Code Ann. § 67-4-2012 -- Excise Tax Apportionment Formula:

> (a)(1) Except as otherwise provided in this part, for tax years beginning prior to July 1, 2016, all net earnings shall be apportioned to this state by multiplying the earnings by a fraction, the numerator of which shall be the property factor plus the payroll factor plus twice the receipts factor, and the denominator of the fraction shall be four (4).

## *Variance Statute and Regulations*

In general, the legislature may delegate to an administrative agency the authority necessary to implement the expressed policy and program of a given statute, so long as there are adequate standards to guide the agency in its exercise of the delegated authority and sufficient safeguards to prevent arbitrary action by the agency. State v. Edwards, 572 S.W.2d 917, 919 (Tenn. 1978). See Vodafone Ams. Holdings, Inc., 2014 WL 2895900, at *11-12.

Tennessee statutes have long delegated to the Commissioner the power to issue a tax variance. In 1956, Tennessee's variance statute contemplated that any variance would be at the request of the taxpayer, in "peculiar or unusual circumstances" in which the standard tax formula would "work a hardship or injustice" on the taxpayer:

> Variation from standard apportionment formulas - If, because of peculiar or unusual circumstances inherent in a particular case, the application of the above formulas would work a hardship or injustice, the commissioner, upon

---

…

(h)(2)(i) Sales, other than sales of tangible personal property, are in this state, if the earnings-producing activity is performed:

(1) In this state; or

(2) Both in and outside this state and a greater proportion of the earnings-producing activity is performed in this state than in any other state, based on costs of performance.

[24] Tenn. Code Ann. § 67-4-2111 -- Franchise Tax Apportionment Formula:

(a)(1) Except as otherwise provided in this part, for tax years beginning prior to July 1, 2016, the net worth of a taxpayer doing business both in and outside this state shall be apportioned to this state by multiplying such values by a fraction, the numerator of which shall be the property factor plus the payroll factor plus twice the receipts factor, and the denominator of the fraction shall be four (4).
…

(h)(2)(i) Sales, other than sales of tangible personal property, are in this state, if the: (1) Earnings-producing activity is performed in this state; or (2) Earnings-producing activity is performed both in and outside this state and a greater proportion of the earnings-producing activity is performed in this state than in any other state based on costs of performance.

25

application of the taxpayer and upon such showing, is authorized, with the approval of the attorney-general, to adopt such other method of apportionment as would be fair and just under the facts of the case. [Tenn. Pub. Acts. 1937, ch. 99, § 1; c. sup. 1950. § 1316].

Tenn. Code Ann. § 67-2711 (1956). Thus, the statute in effect at that time did not appear to empower the Commissioner to impose a variance on a taxpayer absent a request by the taxpayer. It also required the Commissioner to obtain the approval of Tennessee's Attorney General before issuing a variance. See Am. Bemberg Corp. v. Carson, 219 S.W.2d 169, 171 (Tenn. 1949).

The model uniform tax law that was later adopted, UDITPA, also included a variance provision, Section 18, which authorized an adopting state's tax administrator to issue a variance. Tennessee enacted Section 18 when it adopted UDITPA in 1976. Tennessee's previous variance statute was repealed, and the UDITPA Section 18 provision replaced it, codified as Tennessee Code Annotated section 67-2723 for the excise tax[25] and section 67-2918 for the franchise tax.[26]

---

[25]Section 67-2723 provided, in relevant part:

(a) If the allocation and apportionment provisions do not fairly represent the extent of the taxpayer's business activity in this state, the taxpayer may petition for or the commissioner may require, in respect to all or any part of the taxpayer's business activity, if reasonable:

1.      Separate accounting;

2.      The exclusion of any one or more of the factors;

3.      The inclusion of one or more additional factors which will fairly represent the taxpayer's business activity in this state; or

4.      The employment of any other method to effectuate an equitable allocation and apportionment of the taxpayer's earnings.

(b)      If any factors are excluded from or added to the formula set out in § 67-2714 pursuant to the above subsection, an appropriate change shall be made in the number used as the denominator of the fraction.

Tenn. Code Ann. § 67-2723 (1976).

[26] The relevant portions of section 67-2918 are very similar, and any differences are not pertinent to this appeal. Tenn. Code Ann. § 67-2918 (1976).

Section 18 of UDITPA reflected a standard for the issuance of a variance that differed from the standard in Tennessee's prior variance statute in several key respects. First, it authorized the Commissioner to choose to impose a variance upon a taxpayer, in addition to issuing a variance at the request of a taxpayer. Second, it provided that the Commissioner could issue a variance if UDITPA's allocation and apportionment provisions did not fairly represent the extent of a taxpayer's business activities in the state. Third, Section 18 authorized the Commissioner to require variance from the standard apportionment formula with respect to all or any part of the taxpayer's business activity. Fourth, it specifically authorized the Commissioner to employ, "if reasonable," any of four alternatives: (a) a separate accounting; (b) the exclusion of one or more of the statutory factors; (c) the inclusion of one or more additional factors that would fairly represent the taxpayer's business activity in the state; or (d) the employment of any other method that would effectuate an equitable allocation and apportionment of the taxpayer's income. 81 A.L.R. 6th 97, § 2. Importantly, it also removed the requirement of approval by the Attorney General in all instances pertinent to this appeal.[27] See Tenn. Code Ann. § 67-2723(e) (1976).

In 1977, a year after Tennessee adopted UDITPA, the Department promulgated franchise and excise tax regulations pursuant to the new franchise and excise tax statutes. The regulations were based on model regulations proposed by the Multistate Tax Commission (MTC) in connection with UDITPA. The regulation regarding the issuance of a variance provided in pertinent part:

> [Tennessee Code Annotated sections 67-4-2014 and 67-4-2112] permit a departure from the allocation and apportionment provisions only in limited and specific cases. [Tennessee Code Annotated sections 67-1-2014 and 67-4-2112] may be invoked only in specific cases where unusual fact situations (which ordinarily will be unique and nonrecurring) produce incongruous results under the apportionment and allocation provisions contained in the Franchise and Excise Tax Laws.

Tenn. Comp. R. & Regs. 1320-06-01-.35(1)(a)(4).[28] Thus, the regulation described that a departure from the standard apportionment formula was permitted "only in limited and

---

[27] The statute retained the requirement of approval by the Attorney General in the event of federal legislation inconsistent with the existing Tennessee statutory formulas. Tenn. Code Ann. § 67-2723(e) (1976). In that case, the statute gave the Commissioner the power to adopt alternative formulas consistent with the federal legislation, subject to the approval of the Tennessee Attorney General. Id.

[28] The regulation was updated to refer to the 1984 numbering of the current variance statues, but apparently has not been updated since. To avoid confusion, we substitute the current numbering of the variance statutes when quoting the regulation in this opinion.

specific cases" and said that it may be invoked "where unusual fact situations . . . produce incongruous results." It added parenthetically that such unusual situations would "ordinarily . . . be unique and nonrecurring."[29]

## *1999 Amendments*

In the late 1990s, despite a thriving business economy, Tennessee experienced a tax revenue shortfall. See Hearing on H.B. 1676 Before the House, 101st Gen. Assemb. Reg. Sess., (Tenn. May 24, 1999) (remarks by Rep. Matt Kisber); J. Leigh Griffith, Taxing Tennessee - New Business Taxes for 1999, 35 Tenn. B.J.12 (Aug. 1999) (noting that, despite a booming economy, the administration expected a $350 million shortfall in Tennessee's 1999-2000 budget). Initially, Governor Don Sundquist asked the General Assembly to repeal the sales tax on groceries and implement a payroll tax on businesses, essentially an income tax. Griffith, supra, at 12. The General Assembly decided instead to enact sweeping changes to the franchise and excise tax structure, in order to raise revenues and remedy the so-called "Kroger loophole."[30] See Hearing on H.B. 1676, supra (stating that the amendments were drafted at the request of the Governor and will "plug" the "Kroger loophole."). Among the changes were expansion of the franchise and excise taxes to tax the net earnings and net worth of limited liability companies, limited liability partnerships, limited partnerships, and business trusts.

---

[29]In situations in which the variance was sought by a taxpayer, subsection (1)(c) of the regulation stated that the application for a variance had to set forth the reasons why the statutory apportionment provisions did not fairly represent the extent of the taxpayer's business activity in Tennessee. Tenn. Comp. R. & Regs. 1320-06-01-.35(1)(c). Hearkening back to the variance statute in effect prior to Tennessee's adoption of UDITPA, in which variances were authorized only at the request of a taxpayer, the regulation provided that the taxpayer also had to show "by clear and cogent evidence that peculiar or unusual circumstances exist which would cause application of the said statutory provisions to work a hardship or injustice." Id.

[30] One commentator explained:

> The "Kroger loophole" is a structure whereby an affiliate that is not doing business in Tennessee owns a 99 percent limited partnership interest and the company doing business in Tennessee is the general partner with a one percent interest. This structure has been used for many years but its use was accelerated with legislation codifying the Department of Revenue's position that limited partners (and certain members of board managed LLCs) were not subject to taxation by virtue of the ownership of such an interest . . . Apparently Kroger revised its corporate structure in this manner and through the vagrancies of fate, its structure was referred to as the "Kroger loophole," throughout the legislative process.

Griffith, supra, at 13 n.l.

28

In addition, the legislature expanded the Commissioner's authority under the variance statute. The amendments included a new section, a non-uniform provision not contained in UDITPA, authorizing the Commissioner to use "any other method to source receipts for purposes of the receipts factor" in the numerator of the apportionment formula. Tenn. Code Ann. §§ 67-4-2014(a)(4), -2112(a)(4) (1999 Supp.). The amendments were intended to give the Commissioner more power in fashioning a variance, in order to prevent corporations doing business in Tennessee from shifting income and profits out of the State. See Hearing on S.B. 1806 Before the Senate, 101st Gen. Assemb, Reg. Sess. (Tenn. May 26, 1999) (remarks by Senator Randy McNally) (stating that purpose of the amendments was to give the Commissioner the power to prevent abuse by the use of multiple corporations and the shifting of profits outside of Tennessee); See Hearing on S.B. 1806, Before the Finance, Ways & Means Committee, 101st Gen. Assemb., Reg. Sess. (Tenn. May 25, 1999) (remarks by Governor's Representative, Justin Wilson, stating that amendments are intended to give the Commissioner power to stop fraud and abuse and corporations shifting money out of state). The 1999 amendments also removed any vestige of the Attorney General as a check on the Commissioner's discretion to impose a variance.

Against this backdrop, we consider the variance issued in this case. We look first at whether it comports with the standards in the variance statutes, Tennessee Code Annotated §§ 67-4-2014 and 67-4-2112, and then at whether it is consistent with the Department's variance regulation, Tenn. Comp. R. & Regs. R. 1320-06-01-.35. Finally we consider the overall circumstances to determine whether the Commissioner's imposition of a variance constituted an abuse of his discretion.

### Variance Statute

Tennessee's variance statute regarding excise taxes, Tennessee Code Annotated § 67-4-2014, provides in pertinent part:

(a) If the tax computation, allocation or apportionment provisions of this part or chapter 2 of this title do not fairly represent the extent of the taxpayer's business activity in this state, . . . the taxpayer may petition for, or the department through its delegates may require, in respect to all or any part of the taxpayer's business activity, if reasonable:

(1) Separate accounting;

(2) The exclusion of any one (1) or more of the formula factors;

(3) The inclusion of one (1) or more additional apportionment formula factors that will fairly represent the taxpayer's business activity in this state;

29

(4) The use of any other method to source receipts for purposes of the receipts factor or factors of the apportionment formula numerator or numerators; or

(5) The employment of any other method to effectuate an equitable computation, allocation and apportionment of the taxpayer's net earnings or losses that fairly represents the extent of the business entity's activities in Tennessee.

Tenn. Code Ann. § 67-4-2014(a). The variance statute regarding franchise taxes, Tennessee Code Annotated § 67-4-2112, is identical to section 67-4-2014 in all respects relevant to this case.[31] Accordingly, for ease of reference, we will refer to the variance statute in the singular.

The Court of Appeals below neatly capsulized the framework for judicial review of whether the Commissioner's discretionary decision comports with the variance statute:

The standards found in the variance statute are: (a) the apportionment does not fairly represent the extent of the taxpayer's business in Tennessee, and, (b) if (a) is found, then the commissioner may require one of the options in (1)-(5), if it is reasonable to do so. Tenn. Code Ann. § 67-4-2014(a).

Vodafone Ams. Holdings, Inc., 2014 WL 2895900, at *11-12. Thus, to review the Commissioner's decision to impose a variance on Vodafone, the threshold inquiry under the variance statute is whether the standard statutory tax apportionment provisions "do not fairly represent the extent of the taxpayer's business activity in this state. . . ." Tenn. Code Ann. § 67-4-2014(a). If that threshold is met, we look at whether the alternate formula selected by the Commissioner in the variance is "reasonable."

### Fair Representation of Extent of Taxpayer's Business Activity

The trial court below found that, if Vodafone were permitted to use the COP methodology reflected in the statutory apportionment formula, the numerator of the formula would fall by over $1.2 billion, "from $1,357,566,794 to $150,896,965, an 89%

---

[31] The two statutes appear to be identical, except that section 67-4-2112 adds "codified in 26 U.S.C. § 267(f)(1)" after "as defined in § 267(f)(1) of the Internal Revenue Code" in subsection (e) and cites to "§§ 67-4-2110 and 67-4-2111," whereas section 67-4-2014 cites to "§§ 67-4-2011 and 67-4-2012." See Tenn. Code Ann. §§ 67-4-2014, -2112.

30

difference" from the numerator utilized by Vodafone in its original Tennessee franchise and excise tax return. The Commissioner determined that use of the COP methodology would allow Vodafone "to derive substantial receipts from Tennessee markets without such receipts being accounted for in the Tennessee receipts factors of their franchise/excise tax apportionment formulas. . . ." For this reason, the Commissioner determined that computation of Vodafone's franchise and excise taxes according to the statutory formula would "not fairly represent the extent of the taxpayer's business activity" in Tennessee. Tenn. Code Ann. § 67-4-2014(a). Both of the lower courts readily concluded that the Commissioner's determination was warranted under the facts.

Vodafone argues that this result from application of the statutory apportionment formula fairly represents Vodafone's business activity in this State because, well, that is the mathematical result from application of the formula the legislature chose. It points to little more than that.[32]

This reasoning is circular.[33] The language of the variance statue presupposes that, in some instances, an arithmetically correct tax computation utilizing the statutory apportionment formula will not fairly represent the extent of the taxpayer's business activity in Tennessee. Vodafone ignores this premise of the variance statute. Adoption of Vodafone's argument would effectively leave the Commissioner without any discretion to impose a variance in any situation.

An argument similar to Vodafone's argument in this case was rejected by the Court of Appeals in the BAPCO case. BellSouth Advert. & Publ'g Corp. [hereinafter BAPCO], 308 S.W.3d at 365. In that case, the taxpayer multistate corporation compiled and distributed the "Yellow Pages" telephone books. Id. at 355. The taxpayer solicited advertising for its telephone books from Tennessee customers, published the books outside of Tennessee, and then used independent contractors to distribute the books to

---

[32] When asked whether the COP methodology fairly represented Vodafone's business activity in Tennessee, Vodafone's expert, Mr. Swain, said only that application of the statutory formula "reaches a fair result when applied to Vodafone by taking into account all of the costs that are related to providing Verizon Wireless services," effectively ignoring the pivotal factor, the sales receipt numerator in the formula fraction. Beyond that, Mr. Swain also simply maintained that a mechanically correct application of the statutory apportionment formula is, *ergo*, a fair representation of the extent of the taxpayer's business activity in the state.

[33] In its argument, Vodafone closes the circle by appending language to the variance statute: "[U]nder the Variance Statutes, the commissioner only has power to impose a variance in those rare instances in which the statutory method, based on the unique circumstances of a particular taxpayer, fails to fairly represent or measure the business activities of that taxpayer *using the method chosen by the General Assembly*." (emphasis in original) Thus, by adding language that is not contained in the statute, Vodafone argues in effect that the Commissioner may impose a variance only when using the statutory method fails to represent the business activities of the taxpayer using the statutory method.

residences and businesses in Tennessee.  Id.  The Commissioner imposed on the taxpayer a franchise and excise tax variance regarding the service or intangible property portion of the taxpayer's sales receipts.  Id. at 351.  Not unlike the case at bar, the variance essentially required the taxpayer to use the tax computation methodology normally applicable to the sale of tangible property.  Id. at 361.  The result of the variance was to increase the amount of franchise and excise taxes owed by the taxpayer.  Id. at 351.

The taxpayer filed a lawsuit challenging the Commissioner's decision to impose a variance.  Id. at 355.  The taxpayer argued that, under Tennessee's statutory apportionment formula, none of the advertising revenues generated from Tennessee markets would be included in its receipts factors.  Id. at 356.  Because the greater proportion of the taxpayer's earnings-producing activities occurred outside Tennessee, it sourced none of its advertising receipts from Tennessee customers to Tennessee for purposes of the apportionment formula.  Id. at 366.  As a result, it would pay essentially no Tennessee franchise and excise taxes on advertising revenues generated from Tennessee customers.  Id.  The taxpayer argued that Tennessee's franchise and excise tax statute is an "all or nothing" statute; to the extent that a service business has the greater proportion of its costs in Tennessee, all of its receipts would be sourced to Tennessee even if some of the costs of performance occurred elsewhere.  Id.  Likewise, if most of the taxpayer's costs occur elsewhere, then the sales factor would be zero, and such a result was contemplated by the statute.  Id.  The taxpayer argued that permitting the Commissioner to impose a variance when a particular business's sales factor is zero because most of its costs occur outside Tennessee would renders the statute "meaningless."  Id.  The trial court ruled in favor of the taxpayer and the Commissioner appealed.

The Court of Appeals in BAPCO reversed, holding that the Commissioner properly exercised her discretion in imposing the variance.  Id. at 367.  It noted that the fact that application of the statutory formula resulted in the taxpayer owing less than $300,000 in franchise and excise taxes on nearly $900 million in Tennessee advertising revenues was an appropriate basis for the Commissioner to conclude that application of the statutory formula did not fairly represent the extent of the taxpayer's business activities in the state.  Id.  The appellate court rejected the taxpayer's "all or nothing" argument:

> Tenn. Code Ann. §§ 67-4-2014(a) and 67-4-2112(a) were enacted by the legislature to provide the Commissioner with the authority to permit or require a departure from the standard apportionment formula when application of the formula does not fairly represent the extent of the taxpayer's business activity in Tennessee and the Commissioner is given the authority to use any method to source receipts for purposes of the receipts factor or factors of the apportionment formula numerator or numerators.  Moreover, the authors of the UDITPA, and the Tennessee

32

General Assembly were aware that under certain factual scenarios, specifically when the sale of advertising is at issue, the statutory formulas just do not work and the tax collector would necessarily have to impose a variance. Thus, the [taxpayer's] "all or nothing" argument is not persuasive.

Id. at 367. Thus, the BAPCO Court noted that the Legislature, in enacting the variance statute, was aware that the statutory formulas sometimes "just do not work," and so held that the Commissioner's imposition of a variance in such a case was not an abuse of discretion.[34]

In the present case, during the Relevant Period, Vodafone's receipts for telecommunications services for Tennessee customers totaled over $1.3 billion. If Vodafone were permitted to apply the COP method as it advocates in its refund request, this would drop its sales factor to slightly more than $150 million, thereby excluding some 89% of Vodafone's total Tennessee sales receipts. Thus, billions of dollars in Vodafone's revenue from Tennessee customers would become invisible for tax purposes under the standard franchise and excise tax apportionment formula. It is difficult to imagine a more extreme example of a situation in which application of the statutory apportionment formula does not "fairly represent the extent of the taxpayer's business activity in this state." Tenn. Code Ann. § 67-4-2014(a). As stated by the Court of Appeals below: "Such a result is not consistent with the principles adopted in our statutes on taxation for the privilege of doing business in this state." Vodafone Ams. Holdings, Inc., 2014 WL 2895900, at *16. We agree.

Vodafone argues strenuously that upholding the Commissioner's variance in this case would be to allow the Commissioner to "usurp" the legislature's authority to make tax policy choices.[35] The fact that the Commissioner does not like the result under the

---

[34] Vodafone distinguishes the BAPCO case on the basis that it involved advertising revenues, which were cited by UDITPA drafter William Pierce as a specific example of a situation where the statutory formula might not work and a variance might be needed. In contrast, Mr. Pierce never cited telecommunications as such a specific example. This argument is without merit.

[35] In support of its argument that the Commissioner's variance intrudes upon the province of the legislature, Vodafone cites AT&T, 880 S.W.2d at 682. Vodafone cites AT&T for the proposition that "[t]he requirement that . . . each corporation use a standard formula . . . is a matter of Tennessee legislative policy," and describes the variance statute as "to be interpreted narrowly. . . ." Id. at 690-91. We note that AT&T involved a request for a variance *by the taxpayer*. Thus, it presented the converse of the situation in the instant case; the plaintiff taxpayer was asking the Court to override the Commissioner's discretion and *require* the Commissioner to issue a variance. Moreover, the intermediate appellate court's ultimate decision hinged on the finding that the Commissioner did not have the power under the statute to require or permit combined reporting, in light of the fact that there had been no shifting of income among affiliated corporations resulting in a distortion of income. Id. at 687-88.

formula chosen by the legislature, the argument goes, does not give the Commissioner the authority to make a different policy choice through the use of a variance.

Vodafone's argument is contrary to the legislative history of the variance statute outlined above. The legislature has steadily expanded the Commissioner's discretion regarding franchise and excise tax variances. It amended the statute to allow the Commissioner to impose a variance rather than simply grant a taxpayer's request for one. It removed Attorney General approval of variances in all instances. It enlarged, twice, the remedies the Commissioner could adopt through a variance. Indeed, the adoption of UDITPA included granting the Commissioner the authority to impose a variance using "any other method to *source receipts for purposes of the receipts factor . . .* of the apportionment formula numerator," specifically highlighting the receipts factor in the numerator of the apportionment formula. See Tenn. Code Ann. §§ 67-4-2014(a)(4), -2112(a)(4). The Legislature's 1999 amendments augmented the variance authority still more, empowering the Commissioner to employ "any other method *to effectuate an equitable computation, allocation and apportionment of the taxpayer's net earnings . . . that fairly represents the extent of the business entity's activities in Tennessee*." See Tenn. Code Ann. §§ 67-4-2014(a)(5), -2112(a)(5). With the 1999 amendment, the Commissioner's variance authority became significantly broader even than the variance authority originally contained in UDITPA's Section 18. See, e.g., Tenn. Code Ann. §§ 67-4-2014(a)(4); *cf.* Section 18, UDITPA (Tennessee's statute provides the Commissioner with five alternatives in determining a variance, as opposed to Section 18's four alternatives).

This methodical enhancement of the Commissioner's discretionary variance authority demonstrates that the legislature saw the variance as integral to its efforts to prevent corporations doing business in Tennessee from shifting income and profits, and

---

Moreover, it preceded the legislature's 1999 amendments expanding the Commissioner's variance authority. Overall, the AT&T case is not helpful in deciding the issues presented in this appeal.

In a related argument, Vodafone contends that any distortion in the result of its tax computation from the use of the statutory COP method in this case was contemplated by the Legislature, so the Commissioner does not have the authority to impose a variance in order to effect a different result. In support, Vodafone cites Kellogg, 675 S.W.2d at 707 in which the Court stated: "The Commissioner's authority under [the controlling statute] is not properly invoked to rewrite what she perceives to be an unwise provision in the statutory scheme." Id. at 709. Kellogg involved the Commissioner's power in cases of tax evasion, or circumstances similar to section 482 of the Internal Revenue Code, and the statement cited is in connection to a subsection of the variance statute that is not at issue in the case at bar. In Kellogg, the Court held that circumstances similar to those in section 482 were not present and that the Commissioner's attempt at reducing the deduction was not compatible with her authority to allocate among the members of the affiliated group of corporations. Id. at 709-10. We must also respectfully conclude that Kellogg is inapposite to the case at bar.

thus tax revenues, out of the State. The legislature has treated the Commissioner's power to issue a variance as "necessary to implement the expressed policy and program of" the franchise and excise tax statutes." State v. Edwards, 572 S.W.2d 917, 919 (Tenn. 1978). Vodafone's restrictive interpretation of the variance statute would undermine, rather than effectuate, the legislature's tax policy choices.

Vodafone insists that allowing the variance in this case to stand would create chaos for taxpayers who rely on the predictability of the franchise and excise tax statutes. Assuming *arguendo* that this is true, the grant to the Commissioner of substantial variance authority reflects a policy decision that was made by our legislature. The legislative history of the variance statute shows that, over time, the legislature methodically expanded the Commissioner's authority to impose a variance and to require the affected taxpayer to use "any other method" that would result in an apportionment that fairly represents the taxpayer's business activity in this state. As noted by the U.S. Supreme Court, "States have wide latitude" in enacting statutes regarding the taxation of multistate corporations. Moorman Mfg. Co., 437 U.S. at 274. This Court will not, under the guise of judicial review, negate the legislature's policy decisions because Vodafone deems those policy decisions unwise.

Vodafone maintains that the Commissioner should not be allowed to have "unfettered discretion" to impose a new apportionment formula on a taxpayer just because he does not like the result under the statutory formula. The Commissioner, it argues, should not be permitted to have such "unbridled power."

We agree. As noted above, the legislature may delegate authority to implement the policies and programs of the statutes it enacts, but only so long as there are adequate standards to guide the agency in the exercise of the delegated authority and safeguards to prevent arbitrary action. Edwards, 572 S.W.2d at 919. Tennessee's variance statute contains such standards and safeguards, as pointed out by the Court of Appeals in its cogent analysis. The Commissioner may impose a variance, or grant a request for a variance, only if the facts show that application of the standard formula does not fairly represent the extent of the taxpayer's business activity in Tennessee, and the alternate formula in any such variance must be objectively reasonable.

The Commissioner's variance letter in this case demonstrates an awareness that he must meet these standards in exercising his discretion to impose a variance. The letter, reproduced at footnote 8 of this Opinion, outlines his reasoning at length, with specific reference to the statutory standards.

Moreover, the Commissioner's discretion to impose a variance is hardly "unfettered," as shown by this *third* level of judicial review of his decision. The trial court carefully reviewed the evidence and measured the Commissioner's decision against the standards in both the variance statute and the applicable regulation before ultimately

35

concluding that the Commissioner had not abused his discretion. The Court of Appeals likewise engaged in a comprehensive review of the facts in the record, the statutory standards and the policies behind the franchise and excise statutes, the regulation promulgated by the Department to implement the statutes, and considered the Commissioner's exercise of its discretion in light of that analytical framework. We must conclude that this argument is without merit as well.

Under these circumstances, we agree with the holding by the lower courts that the Commissioner had ample basis to conclude that application of the statutory apportionment formula to Vodafone's telecommunications services would not result in a fair representation of Vodafone's business activity in Tennessee.

### *Reasonable Alternate Formula*

The variance statute also provides that the alternate formula selected by the Commissioner in the variance must be "reasonable." Tenn. Code Ann. §§ 67-4-2014(a), -2112(a). In this case, the variance imposed by the Commissioner required Vodafone to calculate its franchise and excise taxes according to the methodology used by Vodafone in its original tax returns for the Relevant Period. In his variance letter, the Commissioner stated: "The PPU methodology originally used by the Taxpayers sources receipts according to the places at which the Taxpayers' customers are located and where the cellphone services are provided. . . . The PPU method is straightforward and conceptually satisfying in that it treats as Tennessee receipts the payments that Tennessee customers/residents make for cellphone services provided by the Taxpayers." The Commissioner also noted that the PPU method was administrable because the Department could verify the state to which receipts from Vodafone's cellphone services should be attributed. "To verify whether a receipt has been correctly attributed to a particular state," the Commissioner stated in his variance letter, "it is only necessary to determine the state in which the cellphone customer from which the payment was received is located." On appeal, Vodafone has little quarrel with the alternate formula in the Commissioner's variance;[36] its arguments focus more on whether the Commissioner should have issued any variance at all.

---

[36] Indeed, as noted by the Commissioner, Vodafone would be hard-pressed to argue that the alternate formula required in the variance is unfair, since it employs the very methodology used by Vodafone in its original tax return. Under the variance statute, had Vodafone believed that this formula did not result in a fair representation of its business activity in this state, it could have requested a variance when it originally filed its tax returns. Moreover, application of the alternate formula is essentially a "wash" for Vodafone; it would not be entitled to the requested refund, but would not be required to pay additional franchise and excise taxes over and above the taxes already paid.

36

We agree with the Commissioner that the PPU method imposed in the variance fairly represents Vodafone's business activity in Tennessee. While no method is perfect, sourcing Vodafone's cellphone service receipts according to the billing address of the customer appears reasonably suited to producing "a rough approximation of the corporate income that is reasonably related to the activities conducted within the taxing State." Blue Bell Creameries, LP, 333 S.W.3d at 65 (quoting Exxon Corp. 447 U.S. at 223. See also Pierce, supra at 780 ("[T]he contribution of the consumer states toward the production of the income should be recognized by attributing sales to those states.").

We also consider whether the alternate apportionment formula adopted by the Commissioner in his variance is consistent with the UDITPA goals of taxing no more or no less than 100 percent of the taxpayer's receipts.[37] In this case, for purposes of appeal, it appears essentially undisputed that, absent the variance, Vodafone's Tennessee receipts would be "nowhere income," that is, would not be subject to franchise or excise taxes in any state.[38] This fact was noted in the Commissioner's variance letter, and the record contains no evidence to the contrary.

In its appellate briefs, Vodafone objects to any consideration of whether its Tennessee sales receipts are taxed in any other jurisdiction. It insists that the question is not relevant, and even goes so far as to assert that "the manner in which a taxpayer may or may not be taxed elsewhere is not a proper inquiry" with respect to the Commissioner's variance.

Respectfully, we doubt Vodafone would be making this argument if the state in which it allegedly incurs the greater proportion of its costs, New Jersey, imposed franchise and excise taxes on Vodafone's receipts for services to Tennessee customers. If that were the case, Vodafone would rightly be clamoring that the alternate formula imposed under the Commissioner's variance was unreasonable because it would result in double taxation of its Tennessee receipts. Likewise, if New Jersey or any other state were taxing Vodafone's Tennessee sales receipts, this might militate against the

---

[37] In the trial court below, the Commission expert, Mr. Miller, noted that a fundamental principle behind UDITPA was to obtain uniformity in state rules of allocation and apportionment so that income of a multistate corporation from a given state would be not assigned to more than one state. In other words, if the ideal were achieved and all states applied the same rules, "no state would include in the numerator of its apportionment factor an item that was included in the numerator of an apportionment factor of another state." The correlating second fundamental principle underlying UDITPA was that no multistate corporation's income should escape taxation; this is sometimes called "nowhere income."

[38] The Commissioner stated that use of the COP methodology would mean that Vodafone's receipts from its Tennessee market would not be recognized in Tennessee or in any other taxing jurisdiction. Vodafone claimed that the Tennessee receipts would be assigned to New Jersey, but New Jersey law would assign the receipts to Tennessee.

imposition of any variance at all. In this case, however, the alternate apportionment formula imposed on Vodafone through the variance appears to present no danger of double taxation, and it comports with the overarching UDITPA goals.

Under all of these circumstances, the statutory requirement that the alternate formula in the variance be "reasonable" has been met as well.

## Variance Regulation

We next consider the pertinent regulation regarding the variance imposed on Vodafone. After essentially repeating the language in the variance statute,[39] the regulation adds the following:

> [Sections 67-4-2014 and 67-4-2112] permit a departure from the allocation and apportionment provisions only in limited and specific cases. [Sections 67-4-2014 and 67-4-2112] may be invoked only in specific cases where unusual fact situations (which ordinarily will be unique and nonrecurring) produce incongruous results under the apportionment and allocation provisions contained in the Franchise and Excise Tax Laws.

Tenn. Comp. R. & Regs. R. 1320-06-01-.35(1)(a)(4). Thus, the regulation states that the variance statutes permit a departure from the statutory apportionment formula "only in limited and specific cases . . . where unusual fact situations . . . produce incongruous results". It adds parenthetically that such situations "ordinarily will be unique and nonrecurring."

Vodafone argues energetically that this regulation limits the Commissioner's authority to impose a variance, and that the variance issued in this case does not fall within the limits provided in the regulation. Vodafone contends that its business model is not "unusual," that its multistate business activities are conducted in a manner similar to numerous other telecommunications providers. For this reason, Vodafone asserts that the subject variance is not imposed in a "limited and specific" case, but rather is in essence imposed on the entire telecommunications industry, a view shared by Amici Curiae the Council on State Taxation, the Institute for Professionals in Taxation, and the Tennessee Cable Telecommunications Association. The phrase "incongruous results," Vodafone asserts, means results not intended by the Legislature, and application of the COP apportionment formula in the franchise and excise tax statutes is precisely what the legislature intended, so there are no "incongruous results" in this case. Therefore,

---

[39] Tenn. Comp. R. & Regs. 1320-06-01.35 was amended by the Department to reflect the 1984 numbering of the variance statutes (Tenn. Code Ann. §§ 67-1-911 & 67-4-812), but has not been updated to reflect the current numbering of the variance statutes, Tenn. Code Ann. §§ 67-4-2014, -2112. To prevent confusion, we substitute the current numbering in the references to the statutes in the regulation.

Vodafone insists, the Commissioner exceeded his authority in imposing the subject variance.

The Commissioner argues that the regulation's use of the phrase "unusual fact situation" does not mean "peculiar to a specific taxpayer" or "rare" as Vodafone contends. Instead, the Commissioner maintains, it denotes a situation in which, for any reason, application of the standard apportionment formula does not reflect the extent of the taxpayer's economic activity in the state. The Commissioner contends that Vodafone's situation qualifies as "unusual" because the multistate wireless telecommunications industry was unknown to the UDITPA drafters, and it cites the admission of that fact by Vodafone's expert Mr. Swain ("I think that the wireless industry was not anticipated by the drafters of UDITPA.").[40] He also argues that an "unusual fact situation" may be presented where, as here, the taxpayer's application of the standard apportionment formula is not administrable, that is, as a practical matter, Vodafone's assertion of where the greater proportion of its costs of performance occurred cannot be verified by the Department.The Commissioner disagrees with Vodafone's contention that the variance contravenes the "unique and nonrecurring" language used in the variance regulation. The Commissioner notes that the variance statute specifically provides that any alternate formula imposed on a taxpayer through a variance "shall continue in effect so long as the circumstances justifying the variation remain substantially unchanged" Tenn. Code Ann. § 67-4-2014(d). Thus, the Commissioner contends, the regulation must be construed in light of the directive in the statute. The Commissioner also points out that the phrase "unique and nonrecurring" is qualified by the word "ordinarily" in the regulation. The Commissioner maintains that the variance in this case is consistent with the regulation.

"Generally, courts must give great deference and controlling weight to an agency's interpretation of its own rules." Jackson Express, Inc. v. Tenn. Pub. Serv. Comm'n, 679 S.W.2d 942, 945 (Tenn. 1984) (Envtl. Def. Fund, Inc. v. Tenn. Water Quality Control Bd., 660 S.W.2d 776, 781 (Tenn. App. 1983) *permission to appeal denied* July 25, 1983; Puerto Rico Mar. Shipping Auth. v. Fed. Mar. Comm'n, 678 F.2d 327 (D.C. Cir. 1982); see also Pickard v. Tenn. Water Quality Control Bd., 424 S.W.3d 511, 522 (Tenn. 2013); BellSouth Advert. & Publ'g Corp. v. Tenn. Regulatory Auth., 79 S.W.3d 506, 514 (Tenn. 2002)). Regulations should be construed in harmony with concomitant statutes and not in contradiction to them. See Tidwell v. RCA Corp., 528 S.W.2d 179, 181 (Tenn. 1975);

---

[40] The Commissioner cites an article on state taxation of multistate corporations by Vodafone's expert Mr. Swain, in which Mr. Swain points out that, at the time UDITPA was drafted, telephone services were public utilities and, as such, were excluded from UDITPA. In the article, Mr. Swain noted the dramatic increase in the service sector of the economy, transformed from when most services were consumed where they were performed, and stated: "Place of performance is no longer a reliable proxy for identifying the marketplace for many services." John A. Swain, Reforming the State Corporate Income Tax: A Market State Approach to the Sourcing of Service Receipts, 83 Tul. L. Rev. 285, 288-89 (2008).

<u>Wright v. Tenn. Peace Officer Standards & Training Comm'n</u>, 277 S.W.3d 1, 15 (Tenn. Ct. App. 2008). Here, Tennessee's regulations were based on model regulations proposed by the Multistate Tax Commission and are identical to those regulations in most respects.[41] Therefore, in construing the variance regulation, we give great deference to the Department's interpretation of its own rules, and we consider the overall intent of Tennessee's variance statute and UDITPA.

We agree with the Commissioner that the subject variance is applied in a "limited and specific" case. In its argument, Vodafone catastrophizes that the Commissioner will impose similar variances on the entire telecommunication industry, effectuating industry-wide change in tax policy. As pointed out by the trial court below, however, this is sheer speculation. There is no evidence in the record of other similar variances, or even of whether other multistate telecommunications corporations share the characteristics that motivated the Commissioner to impose a variance on Vodafone. Moreover, as discussed below, the franchise and excise tax statutes have been amended to address this type of situation. Vodafone's argument is without any basis in the record before us.

We also agree with the Commissioner's interpretation of the phrase "unusual fact situation" in the regulation. As acknowledged by Vodafone's expert, the drafters of UDITPA could not have envisioned a multistate telecommunications service provider such as Vodafone. Reading the regulation as a whole, it states that the Commissioner may impose a variance in "specific cases where unusual fact situations . . . produce incongruous results under the [statutory] apportionment and allocation provisions." Tenn. Comp. R. & Regs. R. 1320-06-01-.35(1)(a)(4). Here, application of the statutory apportionment formula causes millions of dollars in receipts from Vodafone's Tennessee customers to vanish, for tax purposes. This qualifies as an "unusual fact situation" that produces an "incongruous result." <u>See</u> <u>BAPCO</u>, 308 S.W.3d at 367 ("The unusual fact situation in this case is that all of the costs of production occurred outside of Tennessee, but the revenue derived from the end product only occurred when the product was distributed in Tennessee . . . ."); <u>accord</u> <u>Microsoft Corp. v. Franchise Tax Bd.</u>, 139 P.3d 1169, 1181 (Cal. 2006) (disagreeing with taxpayer's contention that the frequency with which issue of large corporate treasury department receipts arises renders situation as "nonunique" under California variance regulation);[42] <u>Union Pac. Corp. v. Idaho State Tax</u>

---

[41] The MTC model regulation allows for the use of variance power to adopt industry-wide exceptions to the statutory apportionment provisions; Tennessee's regulations do not include this provision. <u>See</u> Multistate Tax Comm'n Allocation and Apportionment Regs., Reg. IV. 18(a) (2012). However, as noted above, Tennessee's variance statute includes a provision not contained in UDITPA, empowering the Commissioner to employ "any other method to effectuate an equitable computation, allocation and apportionment of the taxpayer's net earnings . . . that fairly represents the extent of the business entity's activities in Tennessee." Tenn. Code Ann. §§ 67-4-2014(a)(5), -2112(a)(5)

[42] The California Regulation provides:

40

Comm'n, 83 P.3d 116, 120 (Idaho 2004) (holding that effect of different accounting systems was unusual under the Idaho variance regulation, even if underlying situation, the sale of receivables, was not unique).[43]

We also agree with the Commissioner that Vodafone's situation may be considered an "unusual fact situation" that produces "incongruous results" under the variance regulation if application of the statutory COP apportionment formula to Vodafone leaves the Department unable, as a practical matter, to verify Vodafone's representations regarding the situs for the greater proportion of its costs.[44] In such a scenario, without a practical way for the state's tax administrator to verify the taxpayer's representations regarding where the greater proportion of its costs are incurred, the taxpayer would be free to represent that the majority of its costs were incurred in a state with an apportionment formula that left its service-related sales receipts tax-free, thereby creating "nowhere income." We hold that this is an appropriate consideration for the Commissioner in determining if a taxpayer presents an "unusual fact situation" that warrants the issuance of a variance.

As to Vodafone's argument that the "unique and nonrecurring" language in the regulation substantially limits the Commissioner's variance authority, the Court of Appeals in BAPCO held that "the 'ordinarily' qualifier under the rule does not proscribe the issuance of a variance in all such cases." BAPCO, 308 S.W.3d at 367. Similarly, in this case, the Court of Appeals stated: "[T]he use of the word "ordinarily" indicates that this is not a hard and fast requirement." Vodafone Ams. Holdings, Inc., 2014 WL

---

Section 25137 may be invoked only in specific cases where unusual fact situations (which ordinarily will be unique and nonrecurring) produce incongruous results under the apportionment and allocation provisions contained in these regulations.

Cal. Code Regs. tit. 18, § 25137 (2015).

[43] The Idaho Tax Commission Rule in 1991 provided:

Section 63–3027(r) and Article IV.18 permit a departure from the allocation and apportionment provisions of Section 63–3027 and Article IV only in limited and specific cases. Section 63–3027 and Article IV.l8 may be invoked only in specific cases where unusual fact situations (which ordinarily will be unique and non-recurring) produce incongruous results under the apportionment and allocation provisions contained in Section 63–3027 and Article IV. . . .

Tax Commission Rule 27,4.18.a, as quoted by Union Pac. Corp., 83 P.3d at 120.

[44]As noted above, the record indicates that Vodafone's response to interrogatories claimed that the information on which Vodafone relied to prepare the COP analysis was in the possession of Verizon Wireless and was not in the possession or control of the taxpayer Vodafone.

2895900, at *16. The intermediate appellate court also noted that the variance statute specifically provides that the alternate formula imposed by the Commissioner in a variance "*shall* continue in effect so long as the circumstances justifying the variation remain substantially unchanged." Id. (quoting Tenn. Code Ann. § 67-4-2014(d)) (emphasis added). "Clearly," the Court of Appeals commented, "recurrence was envisioned by the statute." Id.

We agree. Again, we are constrained to interpret the regulation in harmony with the overall variance statute, which provides for the continuation of a variance in a "recurring" situation. As the Court of Appeals found, this provision indicates that the Legislature intended for the Commissioner to have the discretion to impose a variance in situations that may not necessarily be "nonrecurring." See also Microsoft Corp., 139 P.3d at 1181 (while language in variance regulation indicates that a variance "'ordinarily' applies to nonrecurring situations, it does not apply only to such situations; the statutory touchstone remains an inquiry into whether the formula 'fairly represent[s]'" a multistate corporation's business activities in a given state).

Vodafone contends that the "unique and nonrecurring" language in the regulation indicates that the Commissioner should not be permitted to impose a variance in circumstances that are better suited for a change in the franchise and excise tax statutes. We respectfully disagree with this assertion. In the trial court below, Benjamin Miller testified that Section 18 of UDITPA is intended to permit a state's tax administrator to impose a variance on an individual taxpayer once he learns of a situation in which the standard formula does not work properly, as through a lawsuit, audit, or request for a refund, and then follow up with efforts to change a statue or regulation if it turns out that the problem has "widespread application."[45] Thus, Mr. Miller's testimony supports an interpretation of the variance statute that envisions that the Commissioner may exercise his discretion to impose a variance for an individual taxpayer even in a recurring situation, so long as the standard methodology or formula does not fairly reflect that taxpayer's business activity in the state. The Commissioner then has the option of following up with efforts to promulgate regulations or modify the statute if it appears that the problem has "widespread application."[46] Since we are obliged to construe the

---

[45] That is apparently what occurred in this case. After this lawsuit was filed, the Legislature enacted numerous changes to the franchise and excise tax statutes, including amendments specifically addressing the sourcing of receipts for taxpayers engaged in the sale of telecommunications service, mobile telecommunications service, Internet access service, video programming service, or direct-to-home satellite television programming service. See Tenn. Code. Ann. §§ 67-4-2012, -2111(effective July 1, 2016) (adopting, among other things, a hybrid market-sourcing costs-of-performance approach to sourcing receipts). These amendments are prospective and are not applicable in this case.

[46] In a similar vein, Vodafone argues that it is improper for the Commissioner to issue a variance that has "retroactive" effect. In this case, Vodafone's refund lawsuit initially claimed that the requisite

42

variance regulation in a manner that is consistent with the variance statute, this would indicate that the "ordinarily unique and nonrecurring" language should not be viewed as a limit on the Commissioner's variance authority.

Moreover, we note that, while this case involves a variance imposed on the taxpayer by the Commissioner, the statute also provides that taxpayers may request a variance. See Tenn. Code Ann. §§ 67-1-2014, -2012; Sherwin-Williams Corp., 989 S.W.2d at 716 (describing variance statute as "bilateral"). Taken in context, the parenthetical in the regulation, "(which *ordinarily* will be unique and nonrecurring)," appears to be intended at least in part as explanation or guidance to taxpayers who may be considering a variance request, rather than language intended by the Department to limit the Commissioner's authority to impose a variance.

Viewing the regulation as a whole and in light of the variance statute and the goals of UDITPA, we hold that the variance imposed on Vodafone in this case is not inconsistent with the variance regulation.

### Within Range of Acceptable Alternatives

As outlined above, pursuant to the variance statute, we have held that the facts in the record provide ample support for the Commissioner's determination that the standard statutory tax apportionment provisions "do not fairly represent the extent of the taxpayer's business activity in this state…" Tenn. Code Ann. §§ 67-1-2014, -2012. We

---

"nexus" was not present. Several years into the litigation, Vodafone amended its complaint to assert that it was entitled to a refund because its original tax returns were not based on the COP methodology set forth in the statutory apportionment formula. This was the first notice to the Commissioner of this theory of recovery, and the Commissioner decided to issue the variance after it was asserted. The Commissioner's expert, Professor Benjamin Miller, testified that this sequence of events was typical and envisioned by the UDITPA drafters:

> [O]ne of the problems . . . Section 18 addresses is the fact that you see these things sometimes the first time in filing a return or through a claim for refund . . ., and it's only then that you become aware that you have an issue or a situation that you might want to deal with that may be unique to the taxpayer.

Our review of Tennessee cases bears out Mr. Miller's observation that variances are often imposed -- or requested by the taxpayer -- regarding tax returns filed years earlier. See, e.g., BAPCO, 308 S.W.3d at 355-56; AT&T, 880 S.W.2d at 684. This is true in other states as well. See, e.g., Microsoft Corp., 139 P.3d at 1173; Twentieth Century-Fox Film Corp., 700 P.2d at 1037. Were we to accept Vodafone's argument, the Commissioner would be precluded from considering any taxpayer request for a variance that related to tax returns filed in the past. We find no language in the variance statute that limits the Commissioner to issuing a "prospective" variance. This argument is without merit.

have held as well that the facts in the record show that the alternate apportionment formula selected by the Commissioner in the variance is "reasonable." Construing the Department's variance regulation in a manner that is consonant with the variance statutes, we have also held that the variance issued in this case is not inconsistent with the regulation.

Having held that the variance comports with the applicable statutes and regulation, we consider whether it is an abuse of discretion, that is, whether it is within the range of acceptable alternatives available to the Commissioner, under the overall circumstances. The primary consideration is the policy behind Tennessee's tax laws, stated plainly in its statutes: "Doing business in Tennessee by any person or taxpayer, and/or exercising the corporate franchise, is declared to be a taxable privilege." Tenn. Code Ann. § 67-4-2005 (1999). The excise tax is "imposed . . . on the privilege of doing business in Tennessee in the corporate form." First Am. Nat'l Bank of Knoxville, 751 S.W.2d at 421. For corporations "doing business in this state," the tax is "recompense for the protection of its local activities and as compensation for the benefits it receives from doing business in Tennessee." Tenn. Code Ann. § 67-4-2007; see Vodafone Ams. Holdings, Inc., 2014 WL 2895900, at *11.

Here, the undisputed facts show that Vodafone has received very substantial receipts from telecommunication services to its customers located in Tennessee. Application of the statutory apportionment formula, as reflected in its refund request, would leave Vodafone reaping millions of dollars in receipts from doing business in Tennessee while paying no tax for the privilege of doing so. In contrast, under the variance, Vodafone would be subject to franchise and excise taxes under an apportionment formula that meets the UDITPA goals of fair apportionment to Vodafone of the business it does in Tennessee and taxation of neither more nor less than 100% of the receipts from its Tennessee customers. This is within the range of acceptable alternatives available to the Commissioner. We agree with the conclusion of both the trial court and the majority of the Court of Appeals, and find no abuse of the Commissioner's discretion by imposing the variance on Vodafone for the Relevant Period.

A brief note regarding the partial dissent in this case. We take it that the partial dissent agrees that the requirements of the variance statute have been met in this case, and that it disagrees only with the majority's conclusion that the variance imposed on Vodafone is not inconsistent with the variance regulation, and because of that the partial dissent would hold that the Commissioner abused his discretion by imposing the variance in this case.

While there is ample reason to disagree with the result reached by the partial dissent,[47] the larger issue is that it is inconsistent with our standard of review. At the end of the day, the partial dissent zeroes in on a single word, "unique," . . . in the Department's own regulation, . . . contained in a parenthetical . . . and modified by the word "ordinarily," and based on that concludes that the variance should not be upheld. Such micro-focus is at odds with the larger "bird's eye" view judges must maintain in reviewing agency and executive decisions.

―――――――――

[47]The partial dissent first recites various quotes from the Court of Appeals' decision in AT&T, 880 S.W.2d at 682, to the effect that the party "seeking" a variance has the burden of proving that the statutory standards are met, that the variance statute should "be interpreted narrowly," and that there is a presumption "against the applicability" of the variance statute. The partial dissent's reliance on AT&T is misguided for several reasons. First, the quotes highlighted in the partial dissent relate to the variance statute that was at issue in AT&T, as opposed to any regulation. As noted above, the partial dissent acknowledges that the requirements of the *statute* at issue in this case are met, and quarrels instead with the majority's conclusion as to the *regulation*. AT&T does not even mention any variance regulations. In fact, as detailed in footnote 35 above, the AT&T case could hardly be more dissimilar to the case at bar, down to the fact that it involves another variance statute subsection not applicable here, one that limited (at that time) the Commissioner's authority to allow the taxpayer a variance to file a combined tax return with other affiliated corporations.

Meanwhile, the partial dissent ignores entirely the Court of Appeals' nearly spotted-cow decision in BAPCO, 308 S.W.3d at 350. Unlike AT&T, the BAPCO decision was rendered *after* the legislature's 1999 expansion of the Commissioner's variance authority and interprets the *very regulation at issue here* in a manner that is consistent with our opinion in this case.

The partial dissent makes the sweeping assertion that the variance imposed on Vodafone is "tantamount to imposing an industry-wide variance." Respectfully, this assertion is slightly perplexing. The dissent acknowledges that, "technically," this variance is imposed only on Vodafone. It is undisputed that the franchise and excise tax statutes have been changed to address situations similar to Vodafone's, so even if we were to speculate about matters not in the record, there is no indication that there will even be a need for a future variance, on Vodafone or any other similar business. Moreover, as explained by the Commissioner's expert, Mr. Miller, even if the issue has "widespread application," the Commissioner's use of his variance in this particular case is fully consistent with the intent of the UDIPTA drafters. Under these circumstances, it is unclear how the partial dissent could view the Commissioner's action as the imposition of an "industry-wide variance," tantamount or otherwise.

The partial dissent finds "no factual support" for a conclusion that Vodafone's situation is "ordinarily. . . unique" under the regulation. Respectfully, the record contains ample support for the fact that application of the standard apportionment formula to Vodafone would leave millions, actually *billions*, of dollars in Vodafone revenue from Tennessee customers untouchable by Tennessee taxes. While this fact alone will suffice, it is certainly not all. As explained in the Commissioner's variance letter, application of the standard apportionment formula to Vodafone would not be administrable, that is, it *cannot be audited or verified* by the Commissioner. Under the standard formula, in Vodafone's peculiar circumstances, Vodafone would be left free to claim that the greater proportion of its costs are located in a state that would not tax those receipts, and this assertion could not be audited. See footnote 44 supra. Thus, the record contains abundant factual support to conclude that all of the regulation requirements are met.

45

In order for Vodafone to prevail in this case, it must prove that the variance imposed by the Commissioner constitutes an abuse of his discretion. As set forth above, in evaluating whether Vodafone has met its burden, we are required to defer to the legislature's policy decision to delegate discretionary variance authority to the Commissioner, determine whether there are facts in the record to support the Commissioner's conclusion that the statutory standards are met, confine ourselves to considering only the evidence that is in the appellate record, defer to the Department's interpretation of its own rules, and then, after all of that, determine whether the Commissioner's decision is outside of the range of acceptable alternatives that are available to him. In short, the standard for a reviewing court to strike down the variance in this case is high indeed.

Mindful of our standard of review, we conclude that Vodafone has not met its burden of proving that the Commissioner's exercise of his variance authority in this case amounts to an abuse of his discretion.

## CONCLUSION

We hold that the facts in the record support the Commissioner's determination that, under Tennessee's variance statutes, Tennessee Code Annotated sections 67-4-2014 and 67-4-2112, application of the standard statutory tax apportionment formula does not "fairly represent the extent of [Vodafone's] business activity in this state." The facts in the record also show that the alternate apportionment formula in the variance comports with the statutory directive that the Commissioner's alternative apportionment method be "reasonable." Construing the Department's variance regulation, Tenn. Comp. R. & Regs. R. 1320-6-1-.35, in a way that harmonizes with the variance statutes, we also hold that the variance issued in this case is not inconsistent with the regulation. Finally, considering the policies that underlie Tennessee's tax statutes, we hold that the variance imposed on Vodafone by the Commissioner is not outside of the range of acceptable alternatives available to him and does not constitute an abuse of the Commissioner's discretion.

46

The decision of the Court of Appeals and the trial court is affirmed. Costs on appeal are to be taxed to Plaintiff/Appellants, Vodafone Americas Holdings, Inc., and Subsidiaries, for which execution may issue, if necessary.

_____
JUSTICE HOLLY KIRBY